IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| GARY KIRKINDOLL, § § Plaintiff, § § Civil Action No. 3:11-CV-1921-D VS. § § TEXANS CREDIT UNION, et al., § § Defendants. § | |

MEMORANDUM OPINION
AND ORDER

In this suit arising from events surrounding the termination of a "top hat" executive deferred compensation plan, the court must determine whether ERISA[1] preempts the plaintiff's state-law claims. Concluding that it does not and that defendants have not otherwise moved for summary judgment on these claims, the court denies defendants' motion for summary judgment. The court grants plaintiff's motion for leave to file a second amended complaint.

I

In 2005 plaintiff Gary Kirkindoll ("Kirkindoll") was hired as President of defendant Texans CUSO Services, LLC, d/b/a Texans Financial ("Texans"), a credit union service organization owned by defendant Texans Credit Union ("TCU").[2] As a tool to retain certain

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

[2]In recounting the factual background, the court summarizes the evidence in the light most favorable to Kirkindoll as the summary judgment nonmovant and draws all reasonable inferences in his favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869,

key company executives, TCU created and implemented an Executive Deferred Compensation Plan ("the Plan"). Under the Plan, which was offered to Kirkindoll and two other highly-paid TCU executives, contributions vested when participants attained normal retirement age. A participant became 100% vested before this date, however, if the participant's employment was terminated for any reason other than defined cause, if the participant terminated his employment with TCU for defined good reason, if the participant died or incurred a disability, or upon a change in control of TCU.

In 2010, after TCU began experiencing severe financial distress, its Board of Directors decided to terminate the Plan. According to Kirkindoll, in March 2011 TCU's then-President and Chief Executive Officer, Mike Sauer ("Sauer"), proposed to partially vest Kirkindoll's interest in the Plan in exchange for the Plan's immediate termination. Under the terms proposed in a March 15, 2011 letter ("the March 2011 Agreement"), the Plan would terminate and Kirkindoll would receive $234,068.18$^3$ within 30 days. In signing the March 2011 Agreement, Kirkindoll agreed that his "rights under the Plan [were] being surrendered and cancelled in exchange for the right to receive the Distribution." D. App. 90. By unanimous consent, the Board of Directors terminated the Plan effective April 1, 2011.

---

870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

$^3$According to defendants, this amount represented approximately 30% of Kirkindoll's account dollars after being grossed-up for anticipated taxes, which was the pro rata percentage of the account as of February 28, 2011, based on employment service from Kirkindoll's effective date of participation to his anticipated date of vesting at normal retirement age (i.e., January 1, 2018).

As of May 6, 2011 Kirkindoll had not yet received the agreed-upon amount, and he began to inquire about the status of the payment. In the meantime, as a result of the continued deterioration of TCU's financial condition, the National Credit Union Administration Board ("the NCUAB") had on April 15, 2011 placed TCU into conservatorship and appointed itself as conservator. NCUAB took immediate action to address TCU's financial distress. On May 11, 2011 the NCUAB notified Kirkindoll that, in accordance with federal regulatory powers, it was repudiating the March 2011 Agreement because, among other reasons, the TCU Board of Directors had acted outside its allowable authority in purporting to partially vest Kirkindoll's account and because continuation of the March 2011 Agreement would be burdensome and would hinder the orderly administration of TCU's affairs.

On May 23, 2011 Kirkindoll's employment was terminated as part of a reduction in force. Kirkindoll then filed the instant lawsuit in Texas state court against TCU, Texans, Texans CUSO Partners, LLC ("Texans Partners"), and Texans CUSO Insurance Group, LLC ("TIG").[4] He asserted state-law claims for breach of contract, promissory estoppel, debts, fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty. Defendants removed the case to this court and moved to substitute the NCUAB for defendant TCU. The court granted the motion. After the court denied Kirkindoll's motion to remand, he amended his complaint to add an alternative claim under

---

[4]Texans Partners and TIG are credit union service organizations owned in whole or in part by TCU.

ERISA. Kirkindoll later filed the instant motion for leave to file a second amended complaint, in which he seeks to add a claim for breach of the March 2011 Agreement. Defendants oppose the motion and move to strike Kirkindoll's reply and supporting appendix. They also move for summary judgment. Kirkindoll opposes the motion.

II

When a party moves for summary judgment on a claim for which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the opposing party must go beyond his pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.) (citations omitted). Summary judgment is mandatory if the opposing party fails to meet this burden. *Little*, 37 F.3d at 1076.

III

Defendants maintain that Kirkindoll's state-law claims are completely preempted by ERISA.

A

In enacting ERISA, Congress created a comprehensive civil-enforcement scheme for employee welfare benefit plans that completely preempts any state-law cause of action that "duplicates, supplements, or supplants" an ERISA remedy. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). "A state-law claim that is completely preempted under § 502 is transformed into a new federal claim." *Cardona v. Life Ins. Co. of N. Am.*, 2009 WL 3199217, at *4 (N.D. Tex. Oct. 7, 2009) (Fitzwater, C.J.). In other words, complete preemption "eliminates the state-law claim" and "replaces [it] with a federal claim." *Id*.

"Section 502, by providing a civil enforcement cause of action, completely preempts any state cause of action seeking the same relief, regardless of how artfully pleaded as a state action." *McGowin v. ManPower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004) (quoting *Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 337 (5th Cir. 1999)). In particular, § 502(a)(1)(B) preempts all suits involving ERISA-governed plans "brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A cause of action falls within the scope of § 502(a)(1)(B), and is therefore completely preempted, if (1) the "individual, at some

point in time, could have brought his claim under ERISA § 502(a)(1)(B)," and (2) "where there is no other independent legal duty that is implicated by a defendant's actions." *Davila*, 542 U.S. at 210 (2004); *see also*, *e.g.*, *Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Ins. Co.*, 2006 WL 1663752, at *7 (S.D. Tex. June 13, 2006) ("Complete preemption under § 502(a) requires both standing and the lack of an independent legal duty supporting a state-law claim." (citing *Davila*, 542 U.S. at 210)).

B

To decide whether Kirkindoll's state-law claims are completely preempted, the court must first determine whether the Plan is an ERISA employee welfare benefit plan. *See, e.g., Meyers v. Tex. Health Res.*, 2009 WL 3756323, at *3 (N.D. Tex. Nov. 9, 2009) (Fitzwater, C.J.). In doing so, this court follows a "three-factor test," asking whether "(1) the plan exists; (2) the plan falls within the safe-harbor provision established by the Department of Labor; and (3) the employer established or maintained the plan with the intent to benefit employees." *Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 439 (5th Cir. 2006). To determine the existence of a plan under the first factor, the court looks to the Supreme Court's opinion in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), which defines the existence of an ERISA benefit plan by an "ongoing administrative program" as opposed to a "one-time, lump-sum payment triggered by a single event . . . [which] requires no administrative scheme whatsoever," *id.* at 12. "[D]etermining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for

benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements" is evidence of an administrative scheme. *Id.* at 9.

ERISA is concerned with "'benefit plans' rather than simply with "benefits," because "[o]nly 'plans' involve administrative activity potentially subject to employer abuse." *Id.* at 16. The Court in *Fort Halifax* held that a lump sum severance payment, triggered by a single event that may never occur, is not a "plan" for purposes of ERISA:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12 (emphasis in original). The benefits at issue in *Fort Halifax* were to be provided by the employer pursuant to a state statute that required that "any employer that terminates operations at a plant with 100 or more employees, or relocates those operations more than 100 miles away, must provide one week's pay for each year of employment to all employees who have worked in the plant at least three years." *Id.* at 5. The Supreme Court held that

the statute was not preempted by ERISA "because the statute neither establishes, nor requires an employer to maintain, an employee welfare benefit 'plan'" within the meaning of the ERISA statute. *Id*. at 6.

Courts in the Fifth Circuit have followed *Fort Halifax* in holding that, where plans require a one-time, lump-sum payment triggered by a single specific event, the plans do not require an administrative scheme to meet the employer's obligation and are therefore not ERISA plans. For example, in *Wells v. General Motors Corp.*, 881 F.2d 166 (5th Cir. 1989), the court held that where the employer established a procedure whereby employees could elect to receive a one-time lump sum payment if they ceased working at the employer's plant, this "plan" was not an "employee benefit plan" for purposes of ERISA. *Id.* at 176. The court based its holding on the facts that the plan was not ongoing and that, although employees could elect a two-year installment payment option, there was no need for continuing administration of the payment program. *Id.*

Similarly, in *Fontenot v. NL Industries*, 953 F.2d 960 (5th Cir. 1992), the court addressed a "golden parachute" plan provided by NL Industries to certain employees. *Id.* at 961. The plan required NL Industries to make a one-time lump sum payment to covered employees if there was a change of control in NL Industries. *Id.* The court affirmed the district court's conclusion that the plan was not governed by ERISA, explaining that "NL Industries' severance plan requires no administrative scheme because those employees included in the plan were to receive benefits upon termination regardless of the reason for termination." *Id.* at 963. Accordingly, the "theoretical possibility of a one-time obligation

in the future created no need for an on-going administrative program to process claims and pay benefits." *Id.*

More recently, in *Peace* the panel held there was no "ongoing administrative scheme" to effectuate an annuity even though the employer was required to choose a funding mechanism, calculate the required contributions to the annuity, shop for and purchase the annuity, and ensure the eventual payment of benefits. *Peace*, 462 F.3d at 440. The court concluded that the first three activities all took place before, or at the time of, purchase, and the fourth activity was executed only if payment was triggered by the plaintiff's turning 65. *Id.* It explained that "[e]ach of these activities was performed only once or over a brief period of time and never performed again. Therefore, these were not part of an ongoing administrative scheme." *Id.*; *see also Tinoco v. Marine Chartering Co.*, 311 F.3d 617, 622 (5th Cir. 2002) (holding that severance benefits provided under early retirement program were not covered by ERISA because program did not "require[] an administrative scheme to make ongoing discretionary decisions based on subjective criteria").

In contrast, where benefits plans require managerial discretion, require the employer to analyze the circumstances of each employee's termination separately in light of certain criteria, *see Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 76 (2d Cir. 1996), or involve more than just the one-time payment of severance benefits, courts have held that they are covered by ERISA. For example, in *Suda v. BP Corp. North America, Inc.*, 2006 WL 1049224, at *1 (5th Cir. Apr. 19, 2006) (per curiam) (unpublished opinion), the panel contrasted the plan at issue with the plans in *Fontenot* and *Fort Halifax*. It noted that

> the BP Plan, although establishing a seemingly simple formula for determining the severance allowance for which a terminated BP employee was eligible, made that allowance subject to a variety of deductions that complicated the calculation of the severance allowance. It also provided non-trivial criteria for determining employee eligibility. Moreover, the BP Plan Administrator had wide discretion and the Plan provided for a two-level administrative claims procedure. Furthermore, the BP Plan provided more than a one-time severance payment, it provided ongoing health and life insurance, relocation, and educational aid. BP had to do more than "write a check." All of this required an "ongoing administrative scheme," albeit a modest one.

*Id*. at *1 (citations omitted); *see also Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992) (holding that plan was ERISA plan where, in order to implement severance program, management was required to make case-by-case determinations of whether complaining employee's job was "substantially equivalent" to his pre-acquisition job).

C

The Plan at issue in this case does not require an ongoing administrative program for processing claims and paying benefits. *See Fort Halifax*, 482 U.S. at 12. Nor does it require the type of "'ongoing, particularized, administrative, discretionary analysis' contemplated under ERISA." *Tinoco*, 311 F.3d at 621 (quoting *Bogue*, 976 F.2d at 1323). The Plan provides for the vesting of benefits when a participant reaches "Normal Retirement Age," is terminated for any reason other than for cause, terminates his employment with the company for good reason, dies, incurs a disability, or the company undergoes a change in control. Upon the occurrence of any of these six events, the participant is entitled, within 30

days, to a one-time, lump sum payment of the amount specified in Schedule A.[5]

Although the Plan provides for the appointment of a Plan Administrator and establishes a claims process that includes the right to request review of the denial of a claim, the payment of benefits does not require the type of ongoing administrative scheme that courts have found create an ERISA plan. *See*, *e.g.*, *Suda*, 2006 WL 1049224, at *1. Rather, like the plans in *Fontenot* and *Peace*, the Plan at issue here requires the employer to pay participants a one-time, lump-sum amount, calculated at the time participant status is granted and funded through two prior company contributions, upon the participant's turning "Normal Retirement Age" or upon the occurrence of any of the other triggering events. Aside from the standard record-keeping procedures that the Plan Administrator is required to observe, TCU was required to do "little more than write a check." *Fort Halifax*, 482 U.S. at 12. Once TCU paid participants the amount specified in Schedule A, TCU would have no further responsibility. *Id.* The court concludes that, because the Plan did not require an "ongoing administrative program," *id.*, it is not an ERISA employee welfare benefit plan and thus ERISA does not preempt Kirkindoll's state-law claims.

D

Defendants maintain that Kirkindoll's argument that the Plan is not covered by ERISA "is simply absurd." Ds. Reply Br. 6. They posit that because "top hat plans are exempt from reporting, disclosure, participation, vesting, benefit accrual, funding and fiduciary

---

[5]Schedule A to the Plan as applied to Kirkindoll provides that Normal Retirement Age is 60 and that the company will contribute a total of $1,256,600 to his account.

responsibility under ERISA, the 'administrative' argument made by [Kirkindoll] is nothing more than a red herring." *Id.* Defendants point to no case law, however, that stands for the proposition that the special exemptions that apply to "top hat" plans somehow make these plans not subject to the "ongoing administrative program" requirement of *Fort Halifax*. *See Dakota, Minn. & E. R.R. Corp. v. Schieffer*, 648 F.3d 935, 938 n.3 (8th Cir. 2011) ("But a 'top hat' plan must be an ERISA 'plan' in the first instance." (some internal quotation marks and citation omitted)).

Defendants next argue that the triggering events would be different for each of the three plan participants on a case-by-case basis, and that under the Ninth Circuit's rationale in *Bogue*, this is "sufficient under ERISA to establish the Plan's *bona fide* nature." Ds. Reply Br. 7. The court disagrees. The severance program in *Bogue* provided benefits to executives who, in the event of a takeover, were not offered "substantially equivalent" employment by the purchasing company. *Bogue*, 976 F.2d at 1321. To implement the severance program, management was required to make case-by-case determinations of whether a complaining employee's job was "substantially equivalent" to his pre-acquisition job. *Id.* at 1323. The Ninth Circuit concluded that the plan was covered by ERISA, explaining that

> [a]lthough the program, like the plan[] in *Fort Halifax*[,] . . . was triggered by a single event, that event would occur more than once, at a different time for each employee. There was no way to carry out that obligation with the unthinking, one-time, nondiscretionary application of the plan [as did the] administrators in *Fort Halifax*.

- 12 -

*Id*.  Therefore, the court concluded that the company "was obligated to apply enough ongoing, particularized, administrative, discretionary analysis to make the program in this case a 'plan.'"  *Id*.  Here, by contrast, the Plan provides for the vesting of benefits under a rather simple regimen: when a participant reaches "Normal Retirement Age," is terminated for any reason other than for cause, terminates his employment with the company for good reason, dies, incurs a disability, or the company undergoes a change in control.  When one of these six events occurs, the participant is entitled, within 30 days, to a one-time, lump sum payment in a specified, easily calculable amount.

Moreover, even if the court were to hold that the Plan contemplates some discretionary decisions, courts that have addressed the issue after *Bogue* have held that discretion in determining eligibility for benefits is one factor for the court to consider, but not alone dispositive.  *See*, *e.g.*, *Lettes v. Kinam Gold Inc.*, 3 Fed. Appx. 783, 788 (10th Cir. 2001) (order and judgment) ("Whether a plan administrator has discretion in determining eligibility for benefits may be one factor to be considered in deciding whether an administrative scheme for processing claims is necessary, but it says nothing about whether the plan is sufficiently 'ongoing' to trigger ERISA regulation."); *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997) (holding that although plan required employer to determine whether employee was terminated "for cause," in order to calculate benefits, this level of discretion was "slight" and "failed to rise to the level of ongoing particularized discretion required to transform a simple severance agreement into an ERISA employee benefits plan."); *Delaye v. Agripac, Inc*., 39 F.3d 235, 237 (9th Cir.

1994) (holding that severance of employment contract did not require ongoing administrative scheme, even though employer had to determine if employee was terminated for cause to calculate severance pay). Another factor is whether the Plan requires an ongoing administrative scheme. "The fact that an administrator has even unfettered discretion in determining eligibility for benefits does not mean that the employer has assumed a 'responsibility to pay benefits on a regular basis,' thus causing it to face 'periodic demands on its assets that create a need for financial coordination and control.'" *Lettes*, 3 Fed. Appx. at 788. In the present case, because any discretion that may be required to determine whether one of the triggering events has occurred under the Plan is "slight," and there are no other aspects of the Plan that would require an "ongoing administrative scheme," the potential, without more, for the plan administrator to exercise discretion when determining whether a participant has vested does not convert the Plan into an ERISA employee welfare plan.

Accordingly, because defendants did not move for summary judgment on Kirkindoll's state-law claims on any basis other than ERISA preemption, the court denies their motion for summary judgment.

IV

The court next considers Kirkindoll's motion to file a second amended complaint.

A

Kirkindoll seeks to amend his alternative cause of action under ERISA[6] and to add

---

[6]As far as the court can tell, the only proposed amendment to Kirkindoll's ERISA claim is a non-substantive change to the citation of the statute.

additional alternative causes of action relating to the March 2011 Agreement. Specifically, Kirkindoll seeks to add claims for breach of contract, estoppel, debts, fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty, all relating to the March 2011 Agreement. Kirkindoll concedes that his request for leave to amend is untimely under the scheduling order in this case. He argues, however, that good cause exists to modify the scheduling order because, after receiving NCUAB's initial document production in January 2012—after the deadline to amend in the court's scheduling order—he "now has a better grasp of all the facts surrounding the events in his case, [and] wishes to amend his complaint to add alternative cause[s] of action[] surrounding the March 2011 Agreement." P. Mot. Amend 3.

Defendants oppose the motion, arguing that Kirkindoll has failed to provide persuasive reasons for why he could not timely amend his pleadings. They point out that Kirkindoll had knowledge of the March 2011 Agreement as early as March 2011 because that is when he signed the letter, and they argue that they will be significantly prejudiced if the court grants the motion because the proposed amendments will require that discovery be reopened and that dispositive motion deadlines be extended.

B

When, as here, the deadline for seeking leave to amend pleadings has expired,[7] a court considering a motion to amend must first determine whether to modify the scheduling order

---

[7]Under the September 13, 2011 scheduling order, motions for leave to amend pleadings were due no later than December 12, 2011.

under the Rule 16(b)(4) good cause standard. *See S&W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003); *Am. Tourmaline Fields v. Int'l Paper Co.*, 1998 WL 874825, at *1 (N.D. Tex. Dec. 7, 1998) (Fitzwater, J.). To meet the good cause standard, the party must show that, despite his diligence, he could not reasonably have met the scheduling order deadline. *See S&W Enters.*, 315 F.3d at 535. If the movant satisfies the requirements of Rule 16(b)(4), the court must next determine whether to grant leave to amend under the more liberal standard of Rule 15(a)(2), which provides that "[t]he court should freely give leave when justice so requires." Rule 15(a)(2); *see S&W Enters.*, 315 F.3d at 536; *Am. Tourmaline Fields*, 1998 WL 874825, at *1.

C

The court assesses four factors when deciding whether to grant an untimely motion for leave to amend under Rule 16(b)(4): "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters.*, 315 F.3d at 536 (internal quotation marks and brackets omitted). Applying these factors, the court concludes that Kirkindoll has shown good cause.

Kirkindoll does not dispute that he has known of the existence of the March 2011 Agreement since March 2011. He argues, however, that during written discovery and depositions, facts surfaced that support adding causes of action surrounding the March 2011

Agreement.[8] Specifically, Kirkindoll argues that he discovered that executives within TCU did not give him a complete copy of the Plan when offering the terms of the March 2011 Agreement and that, as a result, TCU "hid" from him that he was potentially leaving money on the table in signing the agreement. According to Kirkindoll, because he did not have this information prior to December 12, 2011, he was unable to amend his complaint before that date.

The next factor the court considers is the importance of the amendment. Kirkindoll posits the amendments are important because they provide an alternative cause of action to recover against defendants. Defendants do not appear to dispute that the amendments are important.

Defendants argue that they will be prejudiced if the court allows the amendment because "the proposed amendments will require that discovery be reopened, and that dispositive motion deadlines be extended in a case that has been pending for nearly a year." Ds. Br. 6. Although the court in principle is not unsympathetic to defendants' position, they

---

[8]Defendants have filed a motion to strike Kirkindoll's reply brief and supporting appendix, arguing that the reply improperly incorporates and argues from an appendix of evidentiary materials that was not included with the motion to amend. Even if the court assumes *arguendo* that it should not consider this evidence, the court will consider the arguments in Kirkindoll's reply brief that are directed to defendants' argument that Kirkindoll knew or should have known before he filed his complaint of the facts on which the proposed amendment was based. Kirkindoll's reply brief merely clarifies the facts that are new to him and that caused him now to have "a better grasp of all the facts surrounding the events in his case." P. Mot. Amend 3. This argument is in reply to arguments raised in defendants' response brief; they are not arguments raised for the first time in a reply. Accordingly, defendants' motion to strike is denied.

have not pointed to a particular hardship they will experience if discovery is reopened or the dispositive motion deadlines are extended.

The fourth factor—the availability of a continuance to cure such prejudice—is factually inapposite.

The court considers the four factors holistically. "It does not mechanically count the number of factors that favor each side." *EEOC v. Serv. Temps, Inc.*, 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009) (Fitzwater, C.J.), *aff'd*, 679 F.3d 323 (5th Cir. 2012). Assessing the factors as a whole, the court holds that Kirkindoll has met the good cause standard for modifying the scheduling order. Kirkindoll has given a sufficient explanation for his failure to timely move to amend, and the amendments he seeks are important. Moreover, other than generalized arguments regarding delay and the need to reopen discovery, defendants have not shown how they will be prejudiced by the amendment.

D

The court next evaluates under the Rule 15(a) standard whether leave to amend should be granted. *S&W Enters.*, 315 F.3d at 536. "The court should freely give leave when justice so requires." Rule 15(a)(2). The court can discern no compelling reason under this lenient standard to deny Kirkindoll leave to amend. The court therefore grants Kirkindoll's motion. He must file his second amended complaint within 14 days of the date this memorandum opinion and order is filed.

\*   \*   \*

For the foregoing reasons, defendants' June 7, 2012 motion for summary judgment is denied, Kirkindoll's April 27, 2012 motion for leave to file second amended complaint is granted, and defendants' May 31, 2012 motion to strike is denied.

**SO ORDERED.**

October 15, 2012.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE