IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| GARY KIRKINDOLL, § | |
| § | |
| Plaintiff, § | |
| § | Civil Action No. 3:11-CV-1921-D |
| VS. § | |
| § | |
| TEXANS CREDIT UNION, et al., § | |
| § | |
| Defendants. § | |

MEMORANDUM OPINION
AND ORDER

In this suit arising from the termination of a "top hat" executive deferred compensation plan, defendants move for summary judgment on the ground that plaintiff's state-law claims are preempted under ERISA.[1] Because the court cannot determine on the present summary judgment record that the plan is an ERISA plan, and because defendants do not adequately seek summary judgment on any other basis, the court denies the motion.[2]

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

[2]The court originally denied defendants' motion in a memorandum opinion and order filed on October 15, 2012, concluding that plaintiff's claims were *not* preempted under ERISA because the deferred compensation plan was *not* an ERISA plan. *Kirkindoll v. Texans Credit Union*, 2012 WL 4866501, at *5-6 (N.D. Tex. Oct. 15, 2012) (Fitzwater, C.J.), *opinion withdrawn in part*, No. 3:11-CV-1921, mem. op. at *1 (N.D. Tex. Dec. 19, 2012) (Fitzwater, C.J.). The court later withdrew its summary judgment decision *sua sponte*, indicating that it would decide defendants' motion anew on the original briefing.

I

In 2005 plaintiff Gary Kirkindoll ("Kirkindoll") was hired as President of defendant Texans CUSO Services, LLC, d/b/a Texans Financial ("Texans"), a credit union service organization owned by defendant Texans Credit Union ("TCU").[3] As a tool to retain certain key company executives, TCU created and implemented an Executive Deferred Compensation Plan ("the Plan"). Under the Plan, which was offered to Kirkindoll and two other highly-paid TCU executives, TCU was to make a contribution of $628,300 in August 2008 and a second contribution in the same amount in January 2009. The Plan provides for the appointment of a "Plan Administrator" to administer the Plan. As of the effective date of the Plan, the Plan Administrator was to be the Compensation Committee of the Board of Directors of TCU ("Committee"), but the Plan states that "the oversight of the day-to-day operation of the Plan shall be delegated to the Human Resources Director" of TCU. Ds. App. 72. The Plan provides for the creation and maintenance of an "Account" for each participant, but it states that the establishment of the account "shall not be construed as giving any person any interest in assets of an Employer or a right to payment other than as provided" in the Plan. *Id.* at 74. Instead, the Plan was to be maintained as an "[un]funded plan," *id.* at 69, with participants' rights to benefits vesting when they attained normal

---

[3]In recounting the factual background, the court summarizes the evidence in the light most favorable to Kirkindoll as the summary judgment nonmovant and draws all reasonable inferences in his favor. *See*, *e.g.*, *Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

retirement age. A participant could become 100% vested before this date if his employment was terminated for any reason other than defined cause, if the participant terminated his employment with TCU for defined good reason, if the participant died or incurred a disability, or upon a change in control of TCU. The Plan also provides:

> The Committee may terminate or suspend the Plan in whole or in part at any time, provided that no such termination or suspension shall deprive a Participant, or person claiming benefits under the Plan through a Participant, of any vested benefit under the Plan up to the date of suspension or termination except as required by applicable law. Upon the complete termination of the Plan, the Committee, in its sole and absolute discretion and provided the Participant has provided substantial services to the Employer on and after the Effective Date, may fully vest the Participant in his Account[.]

*Id.* at 83.

In 2010, after TCU began experiencing severe financial distress, its Board of Directors decided to terminate the Plan, effective April 1, 2011. According to Kirkindoll, in March 2011 TCU's then-President and Chief Executive Officer, Mike Sauer ("Sauer"), proposed to partially vest Kirkindoll's interest in the Plan in exchange for the Plan's immediate termination. Under the terms proposed in a March 15, 2011 letter ("March 2011 Agreement"), the Plan would terminate and Kirkindoll would receive $234,068.18[4] within 30 days. In signing the March 2011 Agreement, Kirkindoll agreed that his "rights under the

---

[4]According to defendants, this amount represented approximately 30% of Kirkindoll's account dollars after being grossed-up for anticipated taxes, which was the pro rata percentage of the account as of February 28, 2011, based on employment service from Kirkindoll's effective date of participation to his anticipated date of vesting at normal retirement age (i.e., January 1, 2018).

Plan [were] being surrendered and cancelled in exchange for the right to receive the Distribution." *Id.* at 90. By unanimous consent, the Board of Directors terminated the Plan effective April 1, 2011.

As of May 6, 2011 Kirkindoll had not yet received the agreed-upon amount, and he began to inquire about the status of the payment. In the meantime, as a result of the continued deterioration of TCU's financial condition, the National Credit Union Administration Board ("the NCUAB") had on April 15, 2011 placed TCU into conservatorship and appointed itself as conservator. NCUAB took immediate action to address TCU's financial distress. On May 11, 2011 the NCUAB notified Kirkindoll that, in accordance with federal regulatory powers, it was repudiating the March 2011 Agreement because, among other reasons, the TCU Board of Directors had acted outside its allowable authority in purporting to partially vest Kirkindoll's account and because continuation of the March 2011 Agreement would be burdensome and would hinder the orderly administration of TCU's affairs.

On May 23, 2011 Kirkindoll's employment was terminated as part of a reduction in force. Kirkindoll then filed the instant lawsuit in Texas state court against TCU, Texans, Texans CUSO Partners, LLC ("Texans Partners"), and Texans CUSO Insurance Group, LLC ("TIG").⁵ He asserted state-law claims for breach of contract, promissory estoppel, debts, fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and

---

⁵Texans Partners and TIG are credit union service organizations owned in whole or in part by TCU.

- 4 -

breach of fiduciary duty. Defendants removed the case to this court and moved to substitute the NCUAB for defendant TCU. The court granted the motion. After the court denied Kirkindoll's motion to remand, he amended his complaint to add an alternative claim under ERISA. Kirkindoll later sought, and the court granted, leave to file a second amended complaint, in which he added claims based on the March 2011 Agreement.[6]

Defendants move for summary judgment.[7] Kirkindoll opposes the motion.

II

Defendants maintain that Kirkindoll's state-law claims are preempted by ERISA.

A

To decide whether Kirkindoll's state-law claims are preempted, the court must first determine whether the Plan is an ERISA employee welfare benefit plan. *See, e.g., Meyers v. Tex. Health Res.*, 2009 WL 3756323, at *3 (N.D. Tex. Nov. 9, 2009) (Fitzwater, C.J.). In doing so, this court follows a "three-factor test," asking whether "(1) the plan exists; (2) the plan falls within the safe-harbor provision established by the Department of Labor; and (3) the employer established or maintained the plan with the intent to benefit employees."

---

[6]*Kirkindoll*, 2012 WL 4866501, at *8. The court did not withdraw this part of the memorandum opinion and order when it withdrew its summary judgment decision.

[7]At the time defendants filed their motion for summary judgment, Kirkindoll had not yet filed his second amended complaint, which asserts several claims based on the March 2011 Agreement. Because defendants' summary judgment motion is directed only toward the claims asserted in Kirkindoll's first amended complaint, today's memorandum opinion and order does not consider whether defendants would be entitled to summary judgment on Kirkindoll's claims based on the March 2011 Agreement.

*Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 439 (5th Cir. 2006).[8]

The existence of an ERISA plan is a question of fact. *E.g. Weaver v. Emp'rs Underwriters, Inc.*, 13 F.3d 172, 175 (5th Cir. 1994) ("The district court's finding that the . . . plan was an ERISA plan is a finding of fact[.]"). Although defendants can establish through summary judgment that the plan is an ERISA plan, they are not entitled to summary judgment on this basis if the record would permit a reasonable trier of fact to find that the plan is not an ERISA plan. *See Graham v. Metro. Life Ins. Co.*, 349 Fed. Appx. 957, 960 (5th Cir. 2009) ("While [the plaintiff] is correct that the 'existence *vel non* of a plan is a question of fact,' the appropriate question on summary judgment is whether the 'evidence would have allowed a reasonable trier-of-fact to find that an ERISA plan did not exist.'" (quoting *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 235 (5th Cir. 1995))).

B

To determine whether the plan is an ERISA plan, the court looks to the Supreme Court's decision in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), which defines the existence of an ERISA benefit plan by an "ongoing administrative program" as opposed to a "one-time, lump-sum payment triggered by a single event [that] requires no administrative scheme whatsoever." *Id.* at 12. "[D]etermining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting

---

[8]The parties do not appear to dispute that the Plan satisfies the second and third factors.

requirements" are all evidence of an administrative scheme. *Id.* at 9.

ERISA is concerned with "benefit plans" rather than simply with "benefits," because "[o]nly 'plans' involve administrative activity potentially subject to employer abuse." *Id.* at 16. The Court in *Fort Halifax* held that a lump sum severance payment, triggered by a single event that may never occur, is not a "plan" for purposes of ERISA:

> The requirement of a one-time lump sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12 (emphasis in original). The benefits at issue in *Fort Halifax* were to be provided by the employer pursuant to a state statute that required that "any employer that terminates operations at a plant with 100 or more employees, or relocates those operations more than 100 miles away, must provide one week's pay for each year of employment to all employees who have worked in the plant at least three years." *Id.* at 5. The Supreme Court held that the statute was not preempted by ERISA "because the statute neither establishes, nor requires an employer to maintain, an employee welfare benefit 'plan'" within the meaning of the

ERISA statute. *Id*. at 6.

Courts in the Fifth Circuit have followed *Fort Halifax* in holding that, where plans require a one-time, lump-sum payment triggered by a single specific event, the plans do not require an administrative scheme to meet the employer's obligation and therefore are not ERISA plans. For example, in *Wells v. General Motors Corp.*, 881 F.2d 166 (5th Cir. 1989), the court held that where the employer established a procedure whereby employees could elect to receive a one-time lump sum payment if they ceased working at the employer's plant, this "plan" was not an "employee benefit plan" for purposes of ERISA. *Id.* at 176. The court based its holding on the facts that the plan was not ongoing and that, although employees could elect a two-year installment payment option, there was no need for continuing administration of the payment program. *Id.*

Similarly, in *Fontenot v. NL Industries, Inc.*, 953 F.2d 960 (5th Cir. 1992), the court addressed a "golden parachute" plan provided by NL Industries to certain employees. *Id.* at 961. The plan required NL Industries to make a one-time lump sum payment to covered employees if there was a change of control in NL Industries. *Id.* at 962. The court affirmed the district court's conclusion that the plan was not governed by ERISA, explaining that "NL Industries' severance plan requires no administrative scheme because those employees included in the plan were to receive benefits upon termination regardless of the reason for termination." *Id.* at 963. Accordingly, the "theoretical possibility of a one-time obligation in the future created no need for an on-going administrative program to process claims and

pay benefits." *Id.* at 962.

More recently, in *Peace v. American General Life Insurance Co.*, 462 F.3d 437 (5th Cir. 2006), the panel held there was no "ongoing administrative scheme" to effectuate an annuity even though the employer was required to choose a funding mechanism, calculate the required contributions to the annuity, shop for and purchase the annuity, and ensure the eventual payment of benefits. *Id.* at 440. The court concluded that the first three activities all took place before, or at the time of, purchase, and the fourth activity was executed only if payment was triggered by the plaintiff's turning 65. *Id.* It explained that "[e]ach of these activities was performed only once or over a brief period of time and never performed again. Therefore, these were not part of an ongoing administrative scheme." *Id.*; *see also Tinoco v. Marine Chartering Co.*, 311 F.3d 617, 622 (5th Cir. 2002) (holding that severance benefits provided under early retirement program were not covered by ERISA because program did not "require[] an administrative scheme to make ongoing discretionary decisions based on subjective criteria").

Courts in other circuits have likewise determined that there was no administrative scheme where benefits were to be paid in a lump-sum amount and plan administrators were not required to exercise discretion. For example, in *Eide v. Grey Fox Technical Services Corp.*, 329 F.3d 600 (8th Cir. 2003), the plan at issue guaranteed employees that, if they accepted employment with Grey Fox Technology Acquisition Services ("Grey Fox") (Grey Fox had purchased their prior employer) and Grey Fox subsequently terminated their

- 9 -

employment within the first year, they would be paid severance equal to what they would have received under the prior employer's plan. *Id.* at 603. According to the record, the amount of severance pay to be distributed to the employees on termination was set as of the last date of employment with the former employer. *Id.* at 605-06. Accordingly, the determinations were not "made on an individual, ongoing basis, after exercising discretion." *Id.* at 606 (internal quotation marks and citation omitted); *see also Lettes v. Kinam Gold Inc.*, 3 Fed. Appx. 783, 788 (10th Cir. 2001) (holding there was no administrative scheme where golden parachute agreement "was unfunded, contingent on a one-time event that might never happen, and expressly limited to a narrow time period. It involved only nine specific employees and the benefit was to be paid in a lump sum based on a mathematical formula.").

In contrast to these cases, in those instances where benefits plans require managerial discretion, require the employer to analyze the circumstances of each employee's termination separately in light of certain criteria, *see Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 76 (2d Cir. 1996); *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992) (holding that plan was ERISA plan where, in order to implement severance program, management was required to make case-by-case determinations of whether complaining employee's job was "substantially equivalent" to his pre-acquisition job), or involve more than just the one-time payment of severance benefits, courts have held that they are ERISA plans. For example, in *Suda v. BP Corp. North America, Inc.*, 2006 WL 1049224, at *1 (5th Cir. Apr. 19, 2006) (per curiam) (unpublished opinion), the panel contrasted the plan at issue

with the plans in *Fontenot* and *Fort Halifax*. It noted that

> the BP Plan, although establishing a seemingly simple formula for determining the severance allowance for which a terminated BP employee was eligible, made that allowance subject to a variety of deductions that complicated the calculation of the severance allowance. It also provided non-trivial criteria for determining employee eligibility. Moreover, the BP Plan Administrator had wide discretion and the Plan provided for a two-level administrative claims procedure. Furthermore, the BP Plan provided more than a one-time severance payment, it provided ongoing health and life insurance, relocation, and educational aid. BP had to do more than "write a check." All of this required an "ongoing administrative scheme," albeit a modest one.

*Id*. (citations omitted).

Similarly, in *Wilson v. Kimberly-Clark Corp.*, 254 Fed. Appx. 280 (5th Cir. 2007) (per curiam), the panel held that there was an administrative scheme where the plan provided for severance pay to each employee who was involuntarily terminated unless that employee was terminated for cause, voluntarily quit or retired, died, or was terminated as part of a group termination. *Id.* at 282, 283-84. Under the terms of the plan, the committee appointed to administer the plan had "sole discretion to determine whether a termination is voluntar[y] or involuntary, and whether a Participant's termination is for Cause." *Id.* at 282. The court concluded that the plan had an "administrative scheme" because it set forth eligibility requirements that disqualified some potential participants, provided "increasingly detailed formulas for calculating plan benefits," specified how the payment was to be disbursed, and required its Committee to establish "a procedure for handling all claims." *Id.* at 283.

Although the form of payment under the plan was to be a "a lump sum cash payment," the panel held that this did not negate the existence of a clear administrative scheme governing the plan:

> although some lump-sum severance payment arrangements do not fall under ERISA, those arrangements have involved a discrete payment of one benefit that was not distributed according to a plan. Defendant, to the contrary, has shown that it follows specific administrative procedures under a clearly-defined plan in distributing severance benefits.

*Id.* at 283-84.

C

Without mentioning the three-factor test, defendants seek summary judgment on the basis that ERISA preempts Kirkindoll's state-law claims because the Plan is a "top hat" executive deferred compensation plan under ERISA and under 26 U.S.C. § 457(f). Specifically, they maintain that the Plan is a "top hat" plan under § 457(f) because it is limited only to include a select group of managers or highly compensated employees, provides for a substantial risk of forfeiture, and is unfunded. Defendants argue that the Plan qualifies as a "top hat" plan under ERISA because it is "'unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.'" Ds. Br. 21-22 (quoting *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1192-93 (9th Cir. 2007)).

The Plan's status as a "top hat" executive deferred compensation plan under either ERISA or the Tax Code is alone insufficient, however, to establish that the plan satisfies the

- 12 -

"ongoing administrative scheme" requirement of *Fort Halifax*. *See Dakota, Minn. & E. R.R. Corp. v. Schieffer*, 648 F.3d 935, 938 n.3 (8th Cir. 2011) ("But a 'top hat' plan must be an ERISA 'plan' in the first instance." (some internal quotation marks and citation omitted)). Defendants have therefore failed on this basis to establish that the plan is an ERISA plan.

Defendants posit in their reply brief that, because the triggering events for vesting of each of the three plan participants' accounts would be different and would require a case-by-case determination, this is sufficient under the Ninth Circuit's rationale in *Bogue* "to establish the Plan's *bona fide* nature." Ds. Reply Br. 7. The court disagrees. The severance program in *Bogue* provided benefits to executives who, in the event of a takeover, were not offered "substantially equivalent" employment by the purchasing company. *Bogue*, 976 F.2d at 1321. To implement the severance program, management was required to make a case-by-case determination of whether a complaining employee's job was "substantially equivalent" to his pre-acquisition job. *Id*. at 1323. The Ninth Circuit concluded that the plan was covered by ERISA, explaining that

> [a]lthough the program, like the plan[] in *Fort Halifax*, . . . was triggered by a single event, that event would occur more than once, at a different time for each employee. There was no way to carry out that obligation with the unthinking, one-time, nondiscretionary application of the plan [as did the] administrators in *Fort Halifax*.

*Id*. Therefore, the court concluded that the company "was obligated to apply enough ongoing, particularized, administrative, discretionary analysis to make the program in this case a 'plan.'" *Id*.

- 13 -

Here, by contrast, the summary judgment record permits the conclusion that the Plan provides for the vesting of benefits under a simpler regimen: when a participant reaches "Normal Retirement Age," is terminated for any reason other than for cause, terminates his employment with the company for good reason, dies, incurs a disability, or the company undergoes a change in control.[9] When one of these six events occurs, the participant is entitled, within 30 days, to a one-time, lump sum payment of the amount in the participant's account.[10]

Defendants provide no other basis for concluding that the Plan requires an ongoing administrative scheme.

---

[9]The terms "Cause," "Good Reason," "Disability," and "Change in Control" are all defined under the Plan. Ds. App. 70-71.

[10]Moreover, even if the court were to hold that the Plan contemplates some discretionary decisions, courts that have addressed the issue after *Bogue* have held that discretion in determining eligibility for benefits is one factor for the court to consider, but not alone dispositive. *See*, *e.g.*, *Lettes*, 3 Fed. Appx. at 788 ("Whether a plan administrator has discretion in determining eligibility for benefits may be one factor to be considered in deciding whether an administrative scheme for processing claims is necessary, but it says nothing about whether the plan is sufficiently 'ongoing' to trigger ERISA regulation."); *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997) (holding that although plan required employer to determine whether employee was terminated "for cause," in order to calculate benefits, this level of discretion was "slight" and "failed to rise to the level of ongoing particularized discretion required to transform a simple severance agreement into an ERISA employee benefits plan."); *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237-38 (9th Cir. 1994) (holding that severance of employment contract did not require ongoing administrative scheme, even though employer had to determine if employee was terminated for cause to calculate severance pay).

III

In the context of today's case, defendants are not entitled to summary judgment if the record contains sufficient evidence for the court as trier of fact to reasonably find that the Plan did not require an ongoing administrative scheme.

Preliminarily, the court notes that the summary judgment record appears to be incomplete. The Plan provides that each participant shall receive a "Participation Agreement," and provides for the vesting of each participant's account "[e]xcept as otherwise provided in a Participation Agreement." Ds. App. 73. It further provides that TCU shall make a contribution in the amount and at such times as set forth in Schedule A "and in the Participation Agreement provided to each Participant." *Id.* at 74. So far as the court can determine, neither side has included a copy of the Participation Agreement in the summary judgment record. Without the Participation Agreement, the court cannot determine whether the Plan requires an "ongoing administrative scheme." At a minimum, the Participation Agreement may affect decisions regarding vesting and contribution calculations and timing.

Turning to the evidence that is before the court, the court concludes that language of the version of the Plan in the summary judgment record is inconclusive on the question whether the Plan requires an ongoing administrative scheme. There are some aspects of the Plan that suggest that it *does* require an ongoing administrative scheme. For example, § 8.1 of the Plan authorizes the appointment of a Plan Administrator who shall have the power to promulgate rules, adopt forms, and "take all actions necessary and proper to carry out the

provisions of the Plan." *Id.* at 78. Section 8.2 provides for the submission of claims for benefits to the Plan Administrator, and requires that the Plan Administrator furnish to the claimant a written notice of the disposition of any such claim within 90 days. *Id.* The Plan further provides for review of a claim denial by the Plan Administrator, requires that the Plan Administrator issue a decision on review, and provides for appeal to a third party neutral arbitrator. *Id.* at 79. In addition, although benefits under the Plan are to remain "unfunded," the Plan Administrator is required to "maintain" an account for each Participant, and adjust the account at least quarterly to reflect any additional company contributions as well as "earnings and losses credited on such amounts." *Id.* at 74.[11]

Other aspects of the Plan, however, suggest that it does *not* require the type of "'ongoing, particularized, administrative, discretionary analysis' contemplated under ERISA." *Tinoco*, 311 F.3d at 621 (quoting *Bogue*, 976 F.2d at 1323). The Plan provides for the vesting of benefits when a participant reaches "Normal Retirement Age," is

---

[11]Section 4.3 provides that "Accounts shall be credited with the rate of return generated by the Investment Options," which are defined as

> the investment funds selected by the Plan Administrator pursuant to which earnings shall be credited to amounts deferred under the Plan. Such Investment Options shall be established for bookkeeping purposes only and shall not require the establishment of actual corresponding funds by the Plan Administrator or [TCU]. Any establishment of Investment Options shall be in the sole and absolute discretion of the Plan Administrator[.]

Ds. App. 71-72.

terminated for any reason other than for cause, terminates his employment with the company for good reason, dies, incurs a disability, or the company undergoes a change in control.[12] The terms "Cause," "Good Reason," "Disability," and "Change in Control" are all defined under the Plan. Ds. App. 70-71. *See supra* note 9. Upon the occurrence of any of these six events, the participant is entitled, within 30 days, to a one-time, lump sum payment of the entire amount contained in his "Account." Once the participant receives a lump-sum payment upon the vesting of his account, there are no ongoing obligations of the employer with respect to the participant. In other words, because the determination of eligibility and the payment of benefits do not require discretion, and because once TCU "writes a check," its obligations to the participant end, the Plan does not appear to require an ongoing administrative program for "processing claims and paying benefits." *Fort Halifax*, 482 U.S. at 12. And although the Plan does appear to contemplate at least some ongoing record-keeping function—because the Plan Administrator is required to maintain an "Account" for each Participant—defendants do not argue, nor does the court have any basis from which to conclude, that the "maint[enance]" of such an "Account" requires anything beyond the type of standard record-keeping procedures and simple mathematical calculations that courts have found do *not* constitute an ongoing administrative scheme. *E.g.*, *Lettes*, 3 Fed. Appx. at 788. The court as trier of fact could reasonably find, based on the Plan language as provided by

---

[12]Although the Plan Administrator might be required to determine, based on the individual facts of a participant's circumstances, whether the participant is entitled to benefits under the defined terms of the Plan, the Plan does not vest the Plan Administrator with any discretion in deciding whether the participant is entitled to benefits.

Kirkindoll, that the Plan does not require the type of ongoing administrative scheme that would permit the finding that the Plan "exists" under the Supreme Court's decision in *Fort Halifax*.

Because the record does not appear to include the entire plan, and because there is a genuine issue as to whether the Plan requires an ongoing administrative scheme, defendants are not entitled to summary judgment establishing that ERISA governs the Plan. The court must make this decision as trier of fact.[13]

IV

Although defendants include arguments directed toward the merits of Kirkindoll's claims, as far as the court can determine, defendants have not moved for summary judgment on any basis other than that ERISA preempts all non-federal claims that Kirkindoll asserts. For example, defendants maintain that the Plan was terminated because TCU was in financial distress, that Kirkindoll was separated from employment before any company-paid contributions vested, that Kirkindoll accepted the Plan as written, and that NCUAB's repudiation of the Payment Letter is irrelevant to the question whether Kirkindoll was entitled to distribution of Plan benefits. But defendants fail to connect any of these alleged

---

[13]The question whether the Plan is an ERISA plan is a question of fact that must be determined by the court, as trier of fact. Where this question cannot be resolved by summary judgment, it is often resolved on a stipulated factual record, or on a record that is in part stipulated and in part developed through evidence presented in court. Once the court determines whether the Plan is an ERISA plan, this determination will govern which of Kirkindoll's claims remain for trial, whether they are governed by ERISA, whether any claims are to be tried by jury, and the substantive standards under which any remaining claims are to be adjudicated.

facts to the specific claims Kirkindoll asserts in his complaint or to show why these facts, if true, would entitle them to summary judgment on any of Kirkindoll's claims.[14]

\* \* \*

For the foregoing reasons, defendants' June 7, 2012 motion for summary judgment is denied.

**SO ORDERED.**

January 17, 2013

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[14] Defendants also state in the introduction section of their brief that "Plaintiff's claim for ERISA plan benefits is also flawed because he did not exhaust administrative prerequisites to suit, including requirements for following mandatory claims procedures that include arbitration," Ds. Br. 1-2, yet they do not mention this argument anywhere else in their brief and do not appear to move for summary judgment on this basis.