IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GARY KIRKINDOLL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:11-CV-1921-D |
| VS. | § | |
| | § | |
| NATIONAL CREDIT UNION | § | |
| ADMINISTRATION BOARD, as | § | |
| Conservator of TEXANS CREDIT | § | |
| UNION, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In this suit arising from the termination of the Texans Credit Union Section 457(f)

Executive Deferred Compensation Plan ("the Plan")—a "top hat" plan—defendants maintain

that plaintiff's state-law claims are preempted under ERISA.[1]  This question turns on

whether the Plan is an ERISA employee welfare benefit plan,[2] which, in turn, depends on

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.

[2]The first step in determining whether Kirkindoll's claims are preempted is to decide whether the Plan is an ERISA employee welfare benefit plan.  *See, e.g.*, *Meyers v. Tex. Health Res.*, 2009 WL 3756323, at *3 (N.D. Tex. Nov. 9, 2009) (Fitzwater, C.J.) ("To decide whether at least one of [plaintiff's] state-law claims is completely preempted, the court must first determine whether the Plan is an ERISA employee welfare benefit plan.").  In doing so, this court follows a "three-factor test," asking whether "(1) the plan exists; (2) the plan falls within the safe-harbor provision established by the Department of Labor; and (3) the employer established or maintained the plan with the intent to benefit employees."  *Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 439 (5th Cir. 2006).  The parties do not dispute that the Plan satisfies the second and third factors.  *See, e.g.*, Ds. Post-Hrg. Br. 11 ("Only the first of these tests—ERISA plan existence—is at issue here.").

whether it necessitates the existence of an ongoing administrative program or scheme to meet the employer's obligation.  Following a bench hearing, the court finds and concludes for the reasons that follow that the Plan is an ERISA employee welfare benefit plan.[3]

## I

This is an action by plaintiff Gary Kirkindoll ("Kirkindoll") against defendants National Credit Union Administration Board ("NCUAB"), as Conservator for Texans Credit Union ("TCU"); Texans CUSO Partners, LLC ("Texans Partners"); Texans CUSO Services, LLC d/b/a Texans Financial ("Texans"), and Texans CUSO Insurance Group, LLC ("TIG"). Kirkindoll originally filed this lawsuit in Texas state court against TCU, Texans Partners, Texans, and TIG,[4] asserting state-law claims for breach of contract, promissory estoppel, debts, fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty arising from the termination of the Plan and the failure to make a distribution to him of $234,068.18, in accordance with the terms of a March 15, 2011 letter agreement ("the March 2011 Agreement").  Defendants removed the case to this court and moved to substitute the NCUAB for defendant TCU.  The court granted the motion.  After the court denied Kirkindoll's motion to remand, *see Kirkindoll v. National Credit Union Administration Board*, 2011 WL 5025226, at *2-3 (N.D. Tex. Oct. 21, 2011) (Fitzwater,

---

[3]The court sets out in this memorandum opinion and order its findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).

[4]Texans Partners, Texans, and TIG are credit union service organizations owned in whole or in part by TCU.

C.J.), Kirkindoll amended his complaint to add an alternative claim under ERISA.

Kirkindoll later sought leave to file a second amended complaint that added claims for breach of contract, estoppel, debts, fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty based on the terms proposed in the March 2011 Agreement. Defendants moved for summary judgment, contending that Kirkindoll's state-law claims are preempted by ERISA. In *Kirkindoll v. Texans Credit Union*, 2012 WL 4866501 (N.D. Tex. Oct. 15, 2012) (Fitzwater, C.J.) ("*Kirkindoll II*"), *opinion withdrawn in part*, *Kirkindoll v. National Credit Union Administrative Board*, No. 3:11-CV-1921, mem. op. at *1 (N.D. Tex. Dec. 19, 2012) (Fitzwater, C.J.), the court denied defendants' motion for summary judgment, concluding that the Plan did not require an ongoing administrative program, it was not an ERISA employee welfare benefit plan, and Kirkindoll's state-law claims were not preempted by ERISA. *Id.* at *5. The court granted Kirkindoll leave to file a second amended complaint. *Id.* at *8. After the court withdrew the summary judgment decision in *Kirkindoll II*, it addressed defendants' summary judgment motion anew on the original briefing. In *Kirkindoll v. Texans Credit Union*, 2013 WL 180482 (N.D. Tex. Jan. 17, 2013) (Fitzwater, C.J.) ("*Kirkindoll III*"), the court held that there was a genuine issue of material fact—which the court as trier of fact would have to resolve—regarding whether the Plan required an ongoing administrative scheme. *Id.* at *8 & n.13. Although there were some aspects of the Plan that suggested that it *did* require an ongoing administrative scheme, other aspects of the Plan suggested that it did *not* require the type of ongoing, particularized, administrative,

discretionary analysis contemplated under ERISA. *Id.* at *7. Additionally, it appeared to the court that the summary judgment record was incomplete. *Id.* at *6. Accordingly, the court denied defendants' motion for summary judgment. *Id.* at *8.

After the court issued its decision in *Kirkindoll III*, the parties agreed, with court approval, how the ERISA plan issue would be resolved. Under the agreement, the court convened a hearing limited to the mixed question of fact and law whether the Plan is an ERISA employee welfare benefit plan, and it acted as trier of fact. The court's decision on that question will determine the course of the litigation.

## II

The question whether the Plan is an ERISA employee welfare benefit plan is a mixed question of fact and law. "We have frequently stated that the existence of an ERISA plan within the statutory definition is a question of fact. However, where the factual circumstances are established as a matter of law or undisputed, we have treated the question as one of law to be reviewed de novo." *House v. Am. United Life Ins. Co.,* 499 F.3d 443, 448 (5th Cir. 2007) (citations omitted). "It is clear that, while not so stating, [the Fifth Circuit has] followed [its] sister circuits in treating the existence of an ERISA plan as a mixed question of fact and law." *Id.* at 449. "If there is no genuine issue regarding a fact that is pertinent to th[e] inquiry [whether a plan is an ERISA plan], the court decides [the question] as a matter of law[.]" *Henderson v. Paul Revere Life Ins. Co*., 2013 WL 1875151, at *4

(N.D. Tex. Apr. 19, 2013) (Fitzwater, C.J.).[5]  "If there is a genuine issue of fact, however, the trier of fact must resolve the issue before the court can determine based on the facts so found, and as a matter of law, whether the policy is part of an ERISA plan." *Id.*  Defendants have the burden of proving by a preponderance of the evidence that the Plan is an employee benefit plan under ERISA.[6]

III

In 2003 defendant TCU created and implemented the Plan as a tool to retain certain key executives.  The Plan's stated purpose is to retain TCU's Chief Executive Officer "and such other key executives as may be identified as eligible to participate in the Plan by offering flexible compensation opportunities and to offer such persons an opportunity to build an estate or supplement income for use after retirement."  P. Ex. 1 at 1.[7]  The Plan provides, in pertinent part, that it is

> intended that the Plan shall not constitute a "qualified plan" subject to the limitations of section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code"), nor shall it constitute a "funded plan" for purposes of the Code.  It is also intended that the Plan shall be exempt from the participation and

---

[5]Westlaw reflects that the date of this memorandum opinion and order is May 6, 2013. That is the date the opinion was unsealed.  The date it was filed is April 19, 2013.

[6]Because ERISA preemption is an affirmative defense, defendants bear the burden of proof regarding the existence of an ERISA plan. *Bank of La. v. Aetna U.S. Healthcare Inc.*, 468 F.3d 237, 242 (5th Cir. 2006) (citing cases).

[7]Kirkindoll introduced certain exhibits at the hearing, and the parties agreed that evidence from the appendixes submitted as part of the prior summary judgment filings could be used if not objected to before the hearing commenced.  The court will cite the evidence by the exhibit number or appendix page.

- 5 -

> vesting requirements of Part 2 of Title I of [ERISA], the funding
> requirements of Part 3 of Title I of ERISA, and the fiduciary
> requirements of part 4 of Title I of ERISA by reason of the
> exclusions afforded plans which are unfunded and maintained
> by an employer primarily for the purpose of providing deferred
> compensation for a select group of management or highly
> compensated employees.  The Plan is not intended to meet the
> requirements of an "eligible deferred compensation plan" under
> section 457(b) of the Code.  The Plan is intended to be a
> deferred compensation plan subject to section 457(f) of the
> Code.  As such, benefits payable under the Plan are subject to a
> substantial risk of forfeiture and are conditioned upon the future
> performance of substantial services to the Company.

*Id.* at 1.

At the time of its inception, the Plan was offered to TCU's then-president and Chief Executive Officer, David Addison ("Addison").  TCU thereafter amended and restated the Plan, effective January 1, 2008, in order to offer participant status to Kirkindoll and one other company executive.[8]  Under the Plan, participants are Addison and others who are selected and designated by the Compensation Committee of the Board of Directors of TCU (the "Committee").

Article VIII of the Plan addresses Plan administration.  The Committee serves as the "Plan Administrator," although "the oversight of the day-to-day operation of the Plan [is] delegated to the Human Resources Director" of TCU.  *Id.* at 10.  As Plan Administrator, the Committee

---

[8]In connection with the 2008 amendment of the Plan, TCU also offered Greg Gallant, another highly-paid TCU executive, the right to become a participant in the Plan.

shall take whatever action is necessary in fulfilling the purposes and intent of the Plan.

The Plan Administrator is authorized and empowered to promulgate any rules, regulations and schedules of general applicability, and to adopt such forms which [it] deems necessary in order to carry out the purposes of the Plan and to interpret the terms and conditions of the Plan; provided, however, that no rule, regulation or interpretation shall be contrary to the clearly expressed provisions of the Plan . . . .

*Id.*

Under the Plan, TCU made contributions to an account maintained by the Plan Administrator for each participant. Concerning Kirkindoll, TCU made a contribution of $628,300 to Kirkindoll's account in August 2008 and a second contribution in the same amount in January 2009. TCU was not required to, and did not, make any additional contributions to his account.

Under the Plan, a participant obtains earnings, or incurs losses, from investments made with the contributions. The Committee as Plan Administrator has the sole and absolute discretion to add or delete investment options pursuant to which earnings are credited under the Plan. The Plan participant can choose from among these investment options when making his investment decisions. Each participant's account is to be "adjusted at least quarterly" to reflect additional contributions, earnings, and losses credited on such amounts pursuant to § 4.3 of the Plan ("Computation of Earnings Credited"),[9] and any payment or

---

[9]Section 4.3 provides:

Computation of Earnings Credited.   Accounts shall be credited

withdrawal of such amounts under the Plan.  "Each Participant electing a specific Investment

with the rate of return generated by the Investment Options. The Plan Administrator shall establish separate funds for bookkeeping purposes with respect to each Investment Option to measure a rate of return over a period designated by the Plan Administrator.  The Plan Administrator shall promulgate uniform procedures applicable to all Participants for crediting amounts credited to Accounts based on the performance of the various Investment Options, and shall promulgate procedures for changing such allocation directions.  In addition, the Plan Administrator shall provide a written description of each Investment Option and the direction and allocation rules pertaining to each such option to each Participant in the Plan. Each Participant electing a specific Investment Option agrees, on behalf of himself and his designated Beneficiary, to assume all investment risk in connection with any decrease in amounts credited to his Account or Accounts pursuant to his elected Investment Options.  The Company, each Employer, and the Plan Administrator do not guarantee the performance of any Investment Option.

P. Ex. 1 at 6. (bold font omitted).

The Plan states that the term "Investment Options"

means the investment funds selected by the Plan Administrator pursuant to which earnings shall be credited to amounts deferred under the Plan.  Such Investment Options shall be established for bookkeeping purposes only and shall not require the establishment of actual corresponding funds by the Plan Administrator or the Company.   Any establishment of Investment Options shall be in the sole and absolute discretion of the Plan Administrator and the Plan Administrator may add additional Investment Options and delete existing Investment Options as of the end of any Plan Year quarter without the need for a formal amendment to the Plan.

*Id.* at 3-4.

Option agrees . . . to assume all investment risk in connection with any decrease in amounts credited to his Account or Accounts pursuant to his elected Investment Options."  *Id.* at 6. TCU's CEO did, however, periodically "review[] the status of the [P]lan," including "where the investments were," and make adjustments, if necessary, to the accounting of TCU.  Tr. 33.[10]

Article III of the Plan addresses participation and vesting.  A participant's right to benefits vests when he attains normal retirement age (defined as age 60 in Schedule A).  A participant can become 100% vested before this date if his employment is terminated for any reason other than defined cause, if the participant terminates his employment with TCU for defined good reason, if the participant dies or incurs a disability, or upon a change in control of TCU.  Once any of these "triggering events" occurs, TCU performs a "one-time calculation to figure out how much money [the Plan participant gets]," and pays the Plan participant this amount.  *Id.* at 36.  Once TCU pays what is owed under the Plan, it has no continuing obligations to a Plan participant.

A Plan participant claiming benefits under the Plan is required to file a written claim with the Plan Administrator.  The Plan requires that a written notice of the disposition of any such claim be provided to the participant.  Additionally, the Plan specifies certain information that the Plan Administrator is required to provide the participant if a claim is denied.  The Plan also provides detailed procedures for requesting review of a claim denial

---

[10]Citations to "Tr." are to the transcript of the hearing.

by the Plan Administrator and for arbitration if the claims review procedure "does not result in an outcome thought by the claimant to be in accordance with the Plan." P. Ex. 1 at 11.

Finally, the Plan provides that "[t]he Committee may terminate or suspend the Plan in whole or in part at any time, provided that no such termination or suspension shall deprive a Participant, or person claiming benefits under the Plan through a Participant, of any vested benefit under the Plan up to the date of suspension or termination except as required by applicable law." *Id.* at 15.

In 2010, after TCU began experiencing severe financial distress, TCU's Board of Directors began discussing terminating the Plan. According to Kirkindoll, in March 2011 TCU's then-President and Chief Executive Officer, Mike Sauer, proposed to partially vest Kirkindoll's interest in the Plan in exchange for the Plan's immediate termination. Under the terms proposed in the March 2011 Agreement, the Plan would terminate on April 1, 2011, and Kirkindoll would receive $234,068.18 within 30 days.

On April 15, 2011, as a result of the continued deterioration of TCU's financial condition, the NCUAB placed TCU into conservatorship and appointed itself as conservator. The NCUAB notified Kirkindoll that, in accordance with federal regulatory powers, it was repudiating the March 2011 Agreement because, among other reasons, the TCU Board of Directors had acted outside its allowable authority in purporting to partially vest Kirkindoll's account, and because continuation of the March 2011 Agreement would be burdensome and would hinder the orderly administration of TCU's affairs. The following month, Kirkindoll's employment was terminated as part of a reduction in force.

- 10 -

IV

"In its seminal decision laying out the requirements for the existence of ERISA plans, *Fort Halifax Packing Company, Inc. v. Coyne,* the Supreme Court held that in order to constitute an ERISA plan, a program must necessitate the existence of 'an ongoing administrative program to meet the employer's obligation.'" *Cantrell v. Briggs & Veselka Co.*, 728 F.3d 444, 449 (5th Cir. 2013) (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987)). Since *Fort Halifax* was decided, courts have recognized that, to be an ERISA plan, a program must require that an employer do more than make a one-time lump-sum payment on the occurrence of a single contingency. But courts have sometimes encountered difficulties determining whether a particular program constitutes an "ongoing administrative program," within the meaning of *Fort Halifax*. Because the question "[w]hether a plan exists is fact-specific," *Cantrell*, 728 F.3d at 449, courts have engaged in a process of comparing and contrasting the program in question with the factors on which other courts have relied when deciding that a particular program did or did not qualify as an ERISA plan. *See, e.g., id*. at 449, 451 (stating that "[w]hether a plan exists is fact-specific, so we proceed to explain the case-law backdrop of the inquiry," and after discussing case law, holding "[a]gainst this backdrop [that plaintiffs'] deferred compensation arrangements in their Employment Agreements with [defendant] do not constitute an ERISA plan, but rather are employment contract arrangements governed by state law."); *Crowell v. Shell Oil Co.*, 541 F.3d 295, 305-06 (5th Cir. 2008) (distinguishing letters of agreement from facts of *Fort Halifax* and cash severance payments at issue in *Wells v. General Motors Corp.*, 881 F.2d 166 (5th Cir. 1989),

and *Fontenot v. NL Industries, Inc.*, 953 F.2d 960 (5th Cir. 1992)); *Tinoco v. Marine Chartering Co.*, 311 F.3d 617, 622 (5th Cir. 2002) ("The district court was correct in concluding that the present case resembles *Fort Halifax* more than *Bogue* [*v. Ampex Corp.*, 976 F.2d 1319 (9th Cir. 1992)].").  The court will follow this approach in this case, turning first to Fifth Circuit decisions holding that arrangements were not ERISA plans.

In *Wells* the Fifth Circuit addressed whether a voluntary termination of employment plan was an "employee benefit plan" under ERISA.  *Wells*, 881 F.2d at 175.  Relying on facts that it deemed remarkably similar to those of *Fort Halifax*, the panel held that it was not.  *Id.* at 176.  The defendant, General Motors Corporation ("GM"), established a procedure by which employees could elect to receive a one-time, lump-some payment if they ceased working at GM's plant.  The plan was not ongoing, and there was no need for continuing administration of the payment program (although employees could elect a two-year installment payment option).  *Id.*

In *Fontenot* the Fifth Circuit addressed whether an executive severance plan (a so-called "golden parachute") was an ERISA plan.  *Fontenot*, 953 F.2d at 961.  The plan provided that if an executive was terminated within two years of a change of control, the company would pay the executive a lump sum cash payment of three times his highest annual compensation for the preceding three years, as well as a three-year continuation of certain benefits.  The plaintiff was not included in the severance plan, and, after the company was taken over and he was denied benefits under the plan, he sued under ERISA.  *Id.*  The panel held that the severance plan at issue was not distinguishable from the alleged plans in *Fort*

*Halifax* and *Wells*. *Id.* at 962. The plan involved a one-time, lump-sum payment triggered by a single event that might never materialize, it required no administrative scheme whatsoever to meet the employer's obligation, and the employer assumed no responsibility to pay benefits on a regular basis. *Id.*

*Tinoco* involved an early retiree healthcare plan that the plaintiffs maintained was an employee welfare benefit plan within the meaning of ERISA. *Tinoco*, 311 F.3d at 619-20. The panel held that the facts involved in the severance plan were closer to *Fort Halifax* than to *Bogue*. *Id.* at 622. *Bogue* is a decision of the Ninth Circuit, written by Judge Wisdom of the Fifth Circuit, sitting by designation, that "[the Fifth Circuit] has often cited." *Cantrell*, 728 F.3d at 450. The plan offered the plaintiffs the choice of a lump-sum payment or a stream of payments until they reached age 62. *Tinoco*, 311 F.3d at 622. Regardless how they chose to receive payment, the total amount to be paid was based on a one-time calculation using a fixed formula, under which a person's age was added to the number of years of service. The plaintiffs then received a percentage of what they normally would have received in social security based on the total number derived from this formula. Plaintiffs produced no evidence that the plan required an administrative scheme to make ongoing discretionary decisions based on subjective criteria. Citing *Fontenot*, the panel noted that simply because the defendant offered the plaintiffs the option of receiving the payment over time did not mean the plan amounted to an administrative scheme. *Id.*

In *Peace v. American General Life Insurance Co.*, 462 F.3d 437 (5th Cir. 2006), the panel addressed whether an annuity was an employee benefit plan under ERISA. *Id.* at 439.

- 13 -

The plaintiff alleged that the defendant's predecessor in interest induced him to remain by agreeing to purchase an annuity to replace the pension he would lose by leaving his employment. *Id.* at 438. The employer purchased a joint, single-premium annuity over which it retained ownership until it transferred ownership to the plaintiff. *Id.* at 438-39. Applying *Fort Halifax*, the panel held that no plan existed because there was no "ongoing administrative scheme," even though the employer chose a funding mechanism, calculated the required contributions to the annuity, shopped for and purchased the annuity, and ensured the eventual payment of benefits. *Id.* at 440. The panel reasoned that the first three activities all took place before or at the time of purchase of the annuity, and the fourth activity was executed only if payment was triggered by the plaintiff's turning 65. *Id.* "Each of these activities was performed only once or over a brief period of time and never performed again. Therefore, these were not part of an ongoing administrative scheme." *Id.* (footnote omitted).

In *Cantrell* the Fifth Circuit recently held that the deferred compensation arrangements in the plaintiffs' employment agreement contracts were not ERISA plans. *Cantrell*, 728 F.3d at 451. The panel reasoned that there was no necessity for an ongoing administrative program to meet the employer's obligation to provide deferred compensation. It compared the arrangement to the one in *Tinoco*, holding that the amount of deferred compensation to be paid the plaintiffs was based on a one-time calculation using a fixed formula, and that writing a check each quarter was hardly an administrative scheme. The panel contrasted the arrangement with the one in *Bogue*, noting that the plaintiffs' arrangements neither involved discretionary decisions nor explicitly gave the employer

authority to make such discretionary decisions. *Id.* And it distinguished the arrangement from the letters of agreement in *Crowell*, concluding that the amount and duration of payments were fixed, the amount due did not depend on decisions made in underlying ERISA plans, and the deferred compensation agreements did not reference administrative procedures that must be followed. *Id.*

In contrast with the foregoing decisions, in other cases the Fifth Circuit has held that the arrangements at issue were ERISA plans.

In *Suda v. BP Corp. North America, Inc.*, 2006 WL 1049224 (5th Cir. Apr. 19, 2006) (per curiam) (unpublished opinion), the panel addressed whether a severance benefits plan ("BP Plan") was an ERISA employee benefit plan. *Id.* at *1. The plaintiff contended that that the BP Plan was not an ERISA plan because it entitled him to receive a single lump-sum payment, was not complex, and did not require an "ongoing administrative program" or scheme. The panel disagreed, explaining:

> In contrast to the plan in *Fontenot* and the language of *Fort Halifax*, the BP Plan, although establishing a seemingly simple formula for determining the severance allowance for which a terminated BP employee was eligible, made that allowance subject to a variety of deductions that complicated the calculation of the severance allowance. It also provided non-trivial criteria for determining employee eligibility. Moreover, the BP Plan Administrator had wide discretion and the Plan provided for a two-level administrative claims procedure. Furthermore, the BP Plan provided more than a one-time severance payment, it provided ongoing health and life insurance, relocation, and educational aid. BP had to do more than "write a check." All of this required an "ongoing administrative scheme," albeit a modest one.

- 15 -

*Id.* (citations omitted).

In *Crowell* the Fifth Circuit addressed whether letters of agreement that provided for payments to employees when their employer changed control were ERISA plans. *Crowell*, 541 F.3d at 303.  Applying an analysis similar to *Fort Halifax*, the panel noted several important distinctions and concluded that the letters of agreement were covered by ERISA. *Id.* at 305.  Although the benefits at issue involved a cash payment, the payment was embedded within a letter that included a more comprehensive plan; the amount of the monthly pensions and one-time payment relied directly on calculations made in the predecessor company's employee benefits plans; the provision for a one-time cash payment contained explicit language about the "administrative procedures" required for calculation; and the letters of agreement, including the portions referring to the one-time cash payment upon a change of control, required ongoing administrative involvement. *Id.*  The panel distinguished the letters of agreement from the one-time termination benefit distributed in *Wells* and the cash severance payment issued upon a change of control in *Fontenot*. *Id.* at 305-06.  It explained that, although the individual cash payment did not itself require continuing administration, the letter of which it was a part contained other provisions that did. *Id.* at 306.  The cash payment relied on calculations made under plans that required continuing administration, and the letter of agreement referred specifically to administrative procedures that must be followed.  The panel noted that "[t]he payments under the Letters of Agreement would differ substantially depending on the calculations made under the retirement and savings plans for each employee terminated upon a change in control." *Id.*

- 16 -

And unlike *Fontenot* and *Wells*, the cash payments relied on a comprehensive plan or administrative plan, as the panel explained in detail. *Id.* at 306-07.

In *Clayton v. ConocoPhillips Co.*, 722 F.3d 279 (5th Cir. 2013), the Fifth Circuit recently addressed whether an employee change in control severance plan was an ERISA employee benefits plan. *Id.* at 294-96. The plaintiff relied on *Fort Halifax*, *Wells*, and *Fontenot* to argue that only a one-time, lump-sum payment was at issue, not an ongoing administrative program. *Id.* at 295. The defendant maintained that *Fontenot* (and, by extension, *Wells*) were distinguishable, and it contended that the severance plan at issue required an ongoing administrative program that constituted an ERISA plan. It relied on the following: (1) the plan trustee must exercise discretion in determining whether "good reason" exists when a participant terminates his or her employment; (2) the trustee must follow administrative procedures to calculate the severance benefit for each participant ; (3) the plan does not rely on a single event to trigger benefits because a participant can claim benefits any time during a two-year period after a change in control; and (4) the plan provides for ongoing benefits, including a bonus, severance pay, various insurance coverages, and outplacement assistance. *Id.* The Fifth Circuit agreed with the defendant, holding that an "ongoing administrative program" was necessary because of the trustee's discretion concerning claims eligibility. *Id.* at 296. The panel also relied on a district court opinion that had addressed the same severance plan, and on decisions of sister circuits addressing ERISA preemption in comparable circumstances. *Id.*

In *Bogue*, which, as noted above, is a decision of the Ninth Circuit that "[the Fifth

Circuit] has often cited," *Cantrell*, 728 F.3d at 450, the plaintiff sought severance benefits

denied him by his former employer. *Bogue*, 976 F.2d at 1321. He sued to recover under a

program for designated key executives that provided severance benefits if neither the owner

of his current employer nor a purchaser of his employer offered him " substantially

equivalent employment" and his employment was terminated. The program defined

"substantially equivalent employment" as a job that included " responsibilities similar" to

those while the current owner still owned his employer. The plaintiff sought severance

benefits after his employer was purchased and he was offered a position that he did not

consider to be "substantially equivalent" to his old position. The defendant argued that the

program was an ERISA employee benefit plan. *Id.* at 1322. The plaintiff maintained that

it was not because the program had a very short term; it applied only contingently (if the

company was sold and if the employee was denied substantially equivalent work by the

buyer); and it applied only once to any individual employee. The defendant argued that the

program required discretionary decision-making by the plan administrator that was the

hallmark of an ERISA plan. The Ninth Circuit agreed with the defendant. *Id.* Following a

decision of the Third Circuit and the Fifth Circuit's decision in *Fontenot*, the Ninth Circuit

identified "the fence between cases involving real ERISA plans and cases such as *Fort

Halifax*" as "whether the plan in question requires an administrative scheme because the

circumstances of each employee's termination have to be analyzed in light of certain

criteria." *Id.* at 1323 (quoting *Fontenot*, 953 F.2d at 962-63) (internal quotation marks and

brackets omitted). The court reasoned that the program's administrator remained obligated

to decide whether a complaining employee's job was "substantially equivalent" to his pre-acquisition job.  Even though the program, like the plans in *Fort Halifax* and *Wells*, was triggered by a single event, this event would occur more than once, at a different time for each employee.  "There was no way to carry out that obligation with the unthinking, one-time, nondiscretionary application of the plan administrators in *Fort Halifax* and *Wells*." *Id.*  Although it was uncertain whether the plan would apply, the term of the plan was short, and the number of participants was small, "the program's administration required a case-by-case, discretionary application of its terms," and "there was no way to administer the program without an administrative scheme."  *Id.*

V

> The Supreme Court in *Fort Halifax Packing Co.* defined an ERISA plan in terms of the administrative activities required to coordinate and provide benefits under the plan, holding that an ERISA plan covers benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation.  A one-time benefit, on the other hand, such as a one-time, lump-sum payment triggered by a single event, a payment that requires no administrative scheme whatsoever to meet the employer's obligation to pay the employee, is not a plan as defined by ERISA.

*Crowell*, 541 F.3d at 303 (quoting *Fort Halifax*, 482 U.S. at 11, 12) (quotation marks and footnotes omitted).  For at least the following reasons, the court finds and concludes the Plan requires an ongoing administrative program or scheme to meet TCU's obligation.

First, this case does not involve, in the words of *Fort Halifax* and *Crowell*, a one-time payment that requires no administrative scheme whatsoever to meet the employer's

obligation to pay the employee.  After a participant is selected for participation in the Plan, and before he becomes 100% vested, his account in the Plan is maintained and administered on an ongoing basis, and in some respects in accordance with discretionary decisions of the Plan Administrator.  This administrative process could take place over a period of several years, depending on a participant's age at the time of his selection for inclusion in the Plan.  While the participant's account is active, the Plan Administrator is obligated to adjust the account to reflect any additional contributions, earnings, and losses credited on such amounts in accordance with § 4.3 ("Computation of Earnings Credited"), and any payment or withdrawal of such amounts under the Plan.  Under § 4.3, the Plan Administrator must establish separate funds for bookkeeping purposes with respect to each investment option to measure a rate of return over a period designated by the Plan Administrator, promulgate uniform procedures applicable to all participants for crediting amounts credited to accounts based on the performance of the various investment options, and promulgate procedures for changing such allocation directions.  Perhaps most important, the Plan Administrator has ongoing sole and absolute discretion to add and delete investment options that are available to participants.  *See* Tr. 33 ("[T]he committee on a periodic basis reviewed the status of the [P]lan.  On a monthly basis the CFO had to make—review where the investments were and what was in there and make adjustments, if necessary, to the accounting of the credit union on a very regular basis").  In sum, unlike a program that involves a single payment calculated according to an established formula with no more than a modicum of employer involvement, payment under the Plan (even if a one-time, lump sum distribution) is made in accordance

with an ongoing administrative process and is based on contributions plus potential earnings and losses that can be directly impacted by decisions of the Committee as Plan Administrator made in its sole discretion about what investment options are or are not available to the participant over the lifetime of his account.

Second, the Plan does not provide for the payment of benefits only under a straightforward contingency.  In addition to vesting at "Normal Retirement Age," the Plan permits vesting if, for example, a participant terminates his employment for "Good Reason." "Good Reason" includes "a material diminution in the Participant's authority, duties, or responsibilities[.]" P. Ex. 1 at 3.  The Committee as Plan Administrator could be called upon to decide whether a participant who terminated his employment on this basis had done so for "Good Reason" and therefore had vested under the Plan.

Third, the Plan contains detailed procedures for requesting review of a claim denial by the Plan Administrator and for arbitration if the Plan participant disagrees with the outcome of the claims review procedure.  Such detailed claims denial and review processes could come into play if, for example, a participant was deemed to have forfeited his entitlement to Plan benefits because he was terminated for "Cause."  The Plan defines "Cause" as "a finding by the Plan Administrator of any of [four categories] to exist." *Id*. at 2.  The Plan therefore vests discretion in the Committee as Plan Administrator to determine whether a participant has been terminated for "Cause" and has "forfeit[ed] all rights in his Account and no benefit will be payable pursuant to the Plan." *Id.* at 5.

Fourth, the Plan explicitly appoints a "Plan Administrator" "to handle *the*

*administration* of the Plan," *id.* at 4 (emphasis added), and it imposes several explicit powers and duties on the Plan Administrator, including powers (some noted above) in which the Plan Administrator acts in its sole discretion.

This case is distinguishable from *Fort Halifax*, *Wells*, *Fontenot*, *Tinoco*, *Peace*, and *Cantrell*, and is closer factually to *Suda*, *Crowell*, *Clayton*, and *Bogue*.

Unlike *Fort Halifax*, the Plan involves more than a statute that required employers who relocated or terminated their business to do nothing more than make a one-time payment to employees for severance pay based on a fixed formula. As distinguished from *Wells*, the Plan provides for more than a straightforward procedure (with no ongoing plan) under which an employee could elect to receive a one-time, lump-sum payment if he ceased working for the employer. *Fontenot*, unlike the present case, involved a one-time, lump-sum payment triggered by a single event that might never materialize, the program required no administrative scheme to meet the employer's obligation, and the employer assumed no responsibility to pay benefits on a regular basis. *Tinoco* involved a lump-sum payment or a stream of payments based on a one-time calculation using a fixed formula, under which a person's age was added to the number of years of service, and the plaintiffs produced no evidence that the plan required an administrative scheme to make ongoing discretionary decisions based on subjective criteria. *Peace* concerned the purchase of a joint, single-premium annuity and no ongoing administrative scheme. And *Cantrell* is distinguishable because it involved deferred compensation to be paid based on a one-time calculation using a fixed formula, and the arrangements did not involve discretionary decisions.

- 22 -

As in *Suda*, the Plan provides for a multi-level administrative claims procedure (claims denial, review, and arbitration), involves an ongoing administrative scheme (at least the administration of participant investments), and provides a benefit that can vary based on available investment options that the Plan Administrator allows in its discretion.  Like *Crowell*, the Plan requires ongoing administrative involvement (administering participant accounts and making decisions about permissible investment options).  As in *Clayton*, the Committee exercises discretion, such as concerning what are the permissible investment options.  And similar to *Bogue*, the Plan requires an administrative scheme because, if a participant terminates his employment for what he maintains is a "Good Reason," or his employment is terminated for "Cause," the specific circumstances must be analyzed by the Plan Administrator.[11]

In sum, when the facts of this case are compared and contrasted with Supreme Court and Fifth Circuit case law, it is apparent from the totality of the evidence presented at the bench hearing[12] that the Plan requires an ongoing administrative program or scheme and is

---

[11]Kirkindoll argues that the vesting events leave nothing to the employer's discretion because the pertinent terms, such as "Cause," are defined in the Plan.  The court cannot agree that this is correct regarding all defined terms.  For example, "Cause" requires "a finding by the Plan Administrator," P. Ex. 1 at 2, and it involves concepts such as "material breach of . . . policies, procedures and standards," and "lack of faithful performance," which require that the Plan Administrator exercise discretion when deciding whether a participant was terminated for "Cause."

[12]In his post-hearing brief, Kirkindoll relies on a number of individual factors to argue that the Plan is not an ERISA employee welfare benefit plan.  But as Kirkindoll recognizes, "[t]here is no authoritative checklist that can be consulted to determine conclusively if an employer's obligations rise to the level of an ERISA plan.  While a wide array of factors may

therefore an ERISA employee welfare benefit plan.

The court acknowledges that it is reaching a decision that is different from its initial conclusion on summary judgment that the Plan is *not* an ERISA employee welfare benefit plan.  But the court later withdrew that decision, today's ruling is made by the court as trier of fact, based on a more developed evidentiary record, and the court is resolving a question that arises in an admittedly difficult area of the law.  *See, e.g., Cantrell*, 728 F.3d 444 (involving reasoned majority and dissenting opinions concerning whether deferred compensation agreements were ERISA plan).  And regardless whether this change in outcome is warranted on any other ground, justice requires that the court reach the result dictated by the law and a preponderance of the evidence.

VI

In the parties' July 5, 2013 letter, which the court has approved, they request that the court set a new deadline by which defendants may file dispositive motions following the court's decision on the issues presented at the hearing.  Having determined that the Plan is an ERISA employee welfare benefit plan, the court directs the parties to confer regarding the procedure to be followed and to prepare a joint proposal for the court's consideration.

---

be suggested, typically no single act in itself necessarily constitutes the establishment of the plan, fund or program."  P. Post-Hrg. Br. 11 (quoting *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 452 (1st Cir. 1995) (internal quotation marks omitted).

\*     \*     \*

For the foregoing reasons, the court finds and concludes that the Plan is an ERISA employee welfare benefit plan, and it directs the parties to confer regarding the procedure to be followed and to prepare a joint proposal for the court's consideration.

**SO ORDERED.**

November 20, 2013.

SIDNEY A. FITZWATER
CHIEF JUDGE