IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GARY KIRKINDOLL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:11-CV-1921-D |
| VS. | § | |
| | § | |
| NATIONAL CREDIT UNION | § | |
| ADMINISTRATIVE BOARD, AS | § | |
| CONSERVATOR OF TEXANS | § | |
| CREDIT UNION, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

This suit arises from the termination of an ERISA[1] "top hat" plan and the repudiation by the conservator for an insured credit union of the contract that terminated the plan and purported to vest a plan participant with partial plan benefits. The parties' cross-motions for summary judgment present several questions, including issues of ERISA preemption, the power of the conservator to repudiate a contract that in its discretion it deemed burdensome, and the consequences of that repudiation, and the availability of state-law claims against the conservator. For the reasons explained, the court denies plaintiff's motion, grants in part and denies in part defendants' motion, raises *sua sponte* that summary judgment should be granted in defendants' favor on other grounds, and concludes that three of plaintiff's state-law claims remain for trial.

---

[1]The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461.

I

Because this case has been the subject of several prior opinions,[2] the court will focus on the background facts that are pertinent to this decision.

In 2005 plaintiff Gary Kirkindoll ("Kirkindoll") was hired as President of defendant Texans CUSO Services, LLC d/b/a Texans Financial ("Texans"), a credit union service organization owned by defendant Texans Credit Union ("TCU").[3]  As a tool to retain certain key company executives, TCU created and implemented the Texans Credit Union Section 457(f) Executive Deferred Compensation Plan ("Plan")—a "top hat" plan—which was offered to Kirkindoll and two other TCU executives.

In 2010, after TCU began experiencing severe financial distress, its Board of Directors determined there was no longer a need to continue the "executive retention" strategy intended by the Plan, and the Board decided to terminate the Plan.  In March 2011 TCU's then-President and Chief Executive Officer, Mike Sauer ("Sauer"), proposed to Kirkindoll that his interest in the Plan be partially vested in exchange for Kirkindoll's surrender and cancellation of any rights he had under the Plan.  In a March 15, 2011 letter

---

[2]*E.g., Kirkindoll v. NCUAB*, 2013 WL 6164093 (N.D. Tex. Nov. 20, 2013) (Fitzwater, C.J.).

[3]Because both parties move for summary judgment, the court will recount the evidence that is undisputed, and, when necessary to set out evidence that is contested, will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (citing *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

(the "March 2011 Agreement") Sauer proposed that the Plan terminate on April 1, 2011 and that Kirkindoll receive $234,068.18[4] within 30 days.  Kirkindoll signed the March 2011 Agreement, and, by unanimous consent, the Board of Directors terminated the Plan effective April 1, 2011.

On April 15, 2011 the National Credit Union Administration Board ("NCUAB") placed TCU into conservatorship and appointed itself as conservator.  NCUAB notified Kirkindoll in a May 11, 2011 letter (the "Repudiation Letter") that, in accordance with its federal regulatory powers, it was repudiating the March 2011 Agreement.  It cited, among other reasons, that the TCU Board of Directors had acted outside its allowable authority in purporting to partially vest Kirkindoll's account, and that continuation of the March 2011 Agreement would be burdensome and hinder the orderly administration of TCU's affairs.  The Repudiation Letter also stated, in relevant part:

> The [NCUAB] as Conservator is not liable for damages for the repudiation of a contract, 12 U.S.C. § 1787(c)(3), except for certain actual and direct compensatory damages.  Damages are determined from the date of the appointment of the Conservator and may not include punitive damages, damages for lost profits or opportunity, or damages for pain and suffering.  Please direct any inquiries regarding actual and direct damages to [name of contact person] at [telephone number of contact person].

---

[4]According to defendants, this amount represented approximately 30% of Kirkindoll's account dollars after being grossed-up for anticipated taxes, which was the pro rata percentage of the account as of February 28, 2011, based on employment service from Kirkindoll's effective date of participation to his anticipated date of vesting at normal retirement age (i.e., January 1, 2018).

P. 6/28/12 App. 65.  Kirkindoll neither telephoned nor otherwise contacted NCUAB.  Nor did he make any claim for benefits under the Plan's administrative provisions.

On May 18, 2011 NCUAB adopted a resolution ratifying the TCU Board of Directors' termination of the Plan and nullifying any payments that were to be made to Kirkindoll.  On May 23, 2011 Kirkindoll's employment was terminated as part of a reduction in force.

Kirkindoll filed the instant lawsuit in Texas state court against TCU, Texans, Texans CUSO Partners, LLC ("Texans Partners"), and Texans CUSO Insurance Group, LLC ("TIG").[5]  He asserted state-law claims for breach of contract, promissory estoppel, debts, fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty.  Defendants removed the case to this court, and on defendants' unopposed motion, the court ordered that NCUAB be substituted in place of TCU as a defendant.  After the court denied Kirkindoll's motion to remand based on NCUAB's status as a party-defendant, he amended his complaint to add an alternative claim under ERISA.

From the time the court denied the motion to remand until the court's decision in *Kirkindoll v. NCUAB*, 2013 WL 6164093 (N.D. Tex. Nov. 20, 2013) (Fitzwater, C.J.) ("*Kirkindoll IV*"), the parties have primarily disputed whether the Plan is an ERISA plan. Following a bench hearing, the court held in *Kirkindoll IV* that it is.  The parties have now filed the instant cross-motions for summary judgment that address the merits of Kirkindoll's

---

[5]Texans Partners and TIG are credit union service organizations owned in whole or in part by TCU.

- 4 -

state-law claims and his alternative ERISA claim.

## II

When parties move for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving parties can meet their summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving parties do so, the opposing parties must go beyond their pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the opposing party fails to meet this burden. *Little*, 37 F.3d at 1076.

When parties move for summary judgment on a claim or defense on which they will have the burden of proof at trial, the parties "must establish 'beyond peradventure all of the essential elements of the claim or defense.'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that the moving parties must demonstrate that there are no genuine and material fact disputes and that the parties are

entitled to summary judgment as a matter of law. *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at \*10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

## III

Kirkindoll asserts two categories of claims in this lawsuit: those "regarding the Plan," 2d Am. Compl. ¶¶ 4.01-4.23, and those "regarding the March 2011 Agreement," *id.* at ¶¶ 4.24-4.44. Before the court considers the merits of the parties' motions related to the claims "regarding the March 2011 Agreement," it must address a threshold matter: defendants' contention that these claims are completely preempted under ERISA.

## A

There are two types of ERISA preemption: conflict and complete preemption. *See Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 275 n.34 (5th Cir. 2004) (discussing ERISA conflict and complete preemption). Conflict (or ordinary) preemption occurs (1) when there is a direct conflict between the operation of federal and state law so that it is impossible to comply with both, or (2) when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the federal statute. *Boggs v. Boggs*, 520 U.S. 833, 844 (1997) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)) (internal quotation marks omitted); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). Complete preemption, on the

other hand, "exists when a remedy falls within the scope of or is in direct conflict with [29 U.S.C. § 1132(a)], and therefore is within the jurisdiction of federal court."  *Haynes v. Prudential Health Care*, 313 F.3d 330, 333 (5th Cir. 2002) (citing *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987)).

Defendants contend that Kirkindoll's state-law claims regarding the March 2011 Agreement are completely preempted by ERISA.[6]  Complete preemption is available under ERISA § 502, the statute's civil-enforcement provision, which "Congress intended to be the exclusive vehicle for suits by a beneficiary to recover benefits from a covered plan."  *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 250 (5th Cir. 1990).  A state-law claim that is completely preempted under § 502 is transformed into a new federal claim.  *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 207-08 (2004).  Section 502(a)(1)(B) preempts all suits involving ERISA-governed plans "brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the

---

[6]Defendants assert in their reply brief that Kirkindoll's state-law claims are preempted by ERISA because "*each* of Mr. Kirkindoll's claims is inseparably intertwined with and requires interpretation of an ERISA plan . . . [and] [i]ndeed the very *formula* Plaintiff uses to calculate alleged damages stems from a single root—Plan benefits."  Ds. 8/7/14 Br. 3. And they cite cases that address *conflict* preemption.  *E.g., id.* at 3-4 (citing *Lee v. Tyco Elecs. Power Sys., Inc*., 2006 WL 1722569, at *6 (N.D. Tex. June 20, 2006) (Fitzwater, J.), in which this court held that a plaintiff's claim was conflict preempted by 29 U.S.C. § 1144(a)).  But they only move for summary judgment based on *complete* preemption.  *See* Ds. 6/17/14 Br. 20 (asserting that "ERISA completely (jurisdictionally) preempts all claims that may be enforced under ERISA § 502(a), which includes all non-ERISA theories urged by Plaintiff in connection with the Plan." (some upper case font omitted)); *id.* at 41 (arguing that Kirkindoll's state-law claims based on the payment letter (i.e., the March 2011 Agreement) "are merged into the ERISA benefits claim").

plan, or to clarify his rights to future benefits under the terms of the plan."   29 U.S.C.

§ 1132(a)(1)(B).  A cause of action falls within the scope of § 502(a)(1)(B), and is therefore

completely preempted, if (1) the "individual, at some point in time, could have brought his

claim under ERISA § 502(a)(1)(B)," and (2) "where there is no other independent legal duty

that is implicated by a defendant's actions."  *Davila*, 542 U.S. at 210.

B

Defendants contend that the March 2011 Agreement is governed by ERISA, and,

because it purports to enable Kirkindoll to receive accelerated partially-vested benefits,

which the Plan does not allow, his attempt to circumvent the Plan through state-law claims

violates "fundamental principles of ERISA preemption."  Ds. 6/17/14 Br. 41.  Defendants

maintain that Kirkindoll's "Texas law claims are merged into the ERISA benefits claim by

operation of law since the dollars described in the [March 2011 Agreement] were a

mathematic subset derived from Plaintiff's unvested Plan dollars."  *Id.*

Kirkindoll responds that, if the March 2011 Agreement is governed by ERISA, it

logically follows that the March 2011 Agreement is a Plan amendment.  And if it is a Plan

amendment, NCUAB lacked authority to repudiate it because the Federal Credit Union Act

("FCUA"), 12 U.S.C. § 1787(c), only permits the repudiation of contracts, not employee

benefit plans.  Kirkindoll posits that the March 2011 Agreement is "nothing more than an

agreement to write a one-time check," and is not governed by ERISA.  P. 7/17/14 Br. 23.

Defendants reply that Kirkindoll's claims regarding the March 2011 Agreement are

completely preempted because they are claims for benefits under the Plan, not because the

- 8 -

March 2011 Agreement is itself an ERISA plan or an amendment to the Plan.  They posit

that, because each claim is inextricably intertwined with the Plan, requires interpretation of

the Plan, and cannot be separated from the Plan, each claim is completely preempted under

ERISA.

C

A state-law cause of action is completely preempted under ERISA § 502(a)(1)(B) only

if the plaintiff "at some point in time, could have brought his claim under ERISA

§ 502(a)(1)(B)," *and* "where there is no other independent legal duty that is implicated by

a defendant's actions."  *Davila*, 542 U.S. at 210.

1

Kirkindoll could not have brought his state-law claims regarding the March 2011

Agreement under § 502(a)(1)(B) of ERISA.  Section 502(a)(1)(B) authorizes civil actions

by a participant "to recover benefits due to him under the terms of his plan, to enforce his

rights under the terms of the plan, or to clarify his rights to future benefits under the terms

of the plan." 29 U.S.C. § 1132(a)(1)(B).  Section 502(a)(1)(B) "is relatively straightforward.

If a participant or beneficiary believes that benefits promised to him under the terms of the

plan are not provided, he can bring suit seeking provision of those benefits." *Davila*, 542

U.S. at 210.  To satisfy the first prong of *Davila*, a claim must asserts rights to which the

plaintiff is entitled "*only* because of the *terms of an ERISA-regulated employee benefit plan.*"

*Id.* (emphasis added)

In his state-law claims regarding the March 2011 Agreement, Kirkindoll does not seek

- 9 -

to recover benefits due to him under the terms of an ERISA plan, to enforce his rights under the terms of an ERISA plan, or to clarify his rights to future benefits under the terms of an ERISA plan.  Instead, he complains that, by signing the March 2011 Agreement, he was entitled to receive $234,068.18 within 30 days, and that he was never paid as promised. Kirkindoll's state-law claims regarding the March 2011 Agreement arise under that agreement, not under the Plan.  *See, e.g., Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1135 (10th Cir. 2014) (holding that breach of contract and related claims were not completely preempted under ERISA where "[t]he contracts under which these claims arise are [two agreements], not the Plan." (citation omitted)); *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941, 947 (9th Cir. 2009) (holding that state-law claims—including for breach of an implied contract, breach of an oral contract, negligent misrepresentation, quantum meruit, and estoppel—were not completely preempted because plaintiff hospital did not contend that sums *were* owed under patient's ERISA plan but because sums were *not* owed under patient's ERISA plan); *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 597 (7th Cir. 2008) (concluding that claims by an ERISA beneficiary's assignee to recover plan benefits were not completely preempted because they "arise not from the plan or its terms, but from the alleged oral representations made by" the plan provider).  Kirkindoll does not contend that he is owed the sum of $234,068.18 under the terms of the Plan, nor could he.  It is uncontested that his receipt of this sum was contingent on his surrendering of any rights that he had under the Plan.  Accordingly, with regard to Kirkindoll's state-law claims related to

the March 2011 Agreement, he could not, at some point, have brought any of these claims under ERISA § 502(a)(1)(B).

2

Nor do Kirkindoll's state-law claims regarding the March 2011 Agreement satisfy the second requirement of *Davila*. Under this element, a claim is completely preempted only when there is no other independent legal duty that is implicated by a defendant's actions. *Davila*, 542 U.S. at 210. "If there is some other independent legal duty beyond that imposed by an ERISA plan, a claim based on that duty is not completely preempted under § 502(a)(1)(B)." *Marin Gen. Hosp.*, 581 F.3d at 949.

Kirkindoll alleges that defendants violated various duties owed to him under state law by failing to pay him the sum of $234,068.18, as promised in the March 2011 Agreement. His state-law claims "are based on 'other independent legal dut[ies]' within the meaning of *Davila*." *Id.* at 950.

D

Accordingly, the court holds that, because Kirkindoll's state-law claims regarding the March 2011 Agreement could not at some point in time have been brought under ERISA § 502(a)(1)(B), and because each of these claims implicates other legal duties that are independent of ERISA, they are not completely preempted.

IV

The court now considers the parties' cross-motions for summary judgment addressed to Kirkindoll's state-law claims regarding the March 2011 Agreement.

- 11 -

A

Kirkindoll moves for summary judgment establishing that he is entitled to recover for breach of the March 2011 Agreement.  He contends that there are no fact issues regarding NCUAB's obligation to pay actual and direct compensatory damages in the amount of $234,068.18; that although 12 U.S.C. § 1787(c) authorizes NCUAB to repudiate some contracts in certain situations, it lacks the authority to terminate a contract for no reason whatsoever; that TCU's performance of the March 2011 Agreement could not have been burdensome because the agreement required the payment of only a fraction of what Kirkindoll was owed under the Plan; and that NCUAB provided no reasoning in the Repudiation Letter that explained how repudiating the March 2011 Agreement would promote the orderly administration of TCU's affairs.

In response to Kirkindoll's motion, and in support of their motion, defendants contend that they are entitled to summary judgment dismissing Kirkindoll's claims in connection with the March 2011 Agreement because NCUAB lawfully repudiated the March 2011 Agreement under 12 U.S.C. § 1787(c)(1); that to the extent Kirkindoll seeks actual and direct compensatory damages, as permitted under 12 U.S.C. § 1787(c)(3)(B), he is not entitled to recover because he never possessed vested Plan benefits; and that, although Kirkindoll was notified that he should direct any inquiries regarding actual and direct damages to NCUAB, he chose not to do so, and he should not be permitted to circumvent the FCUA's statutory scheme by filing suit.

- 12 -

B

To repudiate the March 2011 Agreement, NCUAB invoked its power under 12 U.S.C. § 1787(c)(1),[7] which authorizes a conservator to repudiate any contract to which an insured credit union is a party if NCUAB determines, in its discretion, that the performance of the contract is burdensome and that the repudiation will promote the orderly administration of the credit union's affairs. *See, e.g., Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local 737 v. Auto Glass Emps. Fed. Credit Union*, 72 F.3d 1243, 1248 (6th Cir. 1996) (holding that authority to repudiate contracts under § 1787(c)(1) "is to be exercised in the conservator's discretion."); *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, 2014 WL 297518, at *5 (S.D.N.Y. Jan. 28, 2014) ("[U]nder 12 U.S.C.

---

[7]12 U.S.C. § 1787(c)(1), entitled "Authority to repudiate contracts," provides:

> In addition to any other rights a conservator or liquidating agent may have, the conservator or liquidating agent for any insured credit union may disaffirm or repudiate any contract or lease—
>
> (A) to which such credit union is a party;
>
> (B) the performance of which the conservator or liquidating agent, in the conservator's or liquidating agent's discretion, determines to be burdensome; and
>
> (C) the disaffirmance or repudiation of which the conservator or liquidating agent determines, in the conservator's or liquidating agent's discretion, will promote the orderly administration of the credit union's affairs.

12 U.S.C. § 1787(c)(1).

§ 1787(c), [NCUAB] is empowered to repudiate 'any contract or lease,' so long as four conditions are met: (1) the credit union was a party to the contract; (2) [NCUAB] determines, in its discretion, that the contract is burdensome; (3) [NCUAB] determines, in its discretion, that repudiation would promote the orderly administration of the credit union's affairs; and (4) [NCUAB] repudiates within a 'reasonable period' from when it was appointed conservator or liquidator, as determined by the circumstances of the case."). Kirkindoll does not challenge NCUAB's authority, as conservator, to repudiate contracts to which TCU was a party. Nor does he contend that, in repudiating the March 2011 Agreement, NCUAB did not exercise discretion under § 1787(c)(1). Instead, Kirkindoll contests NCUAB's specific decision to repudiate the March 2011 Agreement and its failure to provide a detailed explanation for doing so.

The case law interpreting NCUAB's repudiation powers and related obligations is relatively sparse. But there is a more extensive body of law that has developed concerning similar powers and obligations of the Federal Deposit Insurance Corporation ("FDIC") and the Resolution Trust Corporation ("RTC") under 12 U.S.C. § 1821(e)(1), a provision of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). Section 1821(e)(1) is, in all material respects, identical to § 1787(c)(1). Courts interpreting § 1821(e)(1) have "uniformly held that a conservator or receiver has complete discretion in making the decision to repudiate and need not make any formal findings as to whether a contract is 'burdensome' or a repudiation is 'necessary to promote orderly administration.'" *Int'l Union*, 72 F.3d at 1250 (citing *1185 Ave. of Americas Assocs. v. Resolution Trust Corp.*,

22 F.3d 494, 498 (2d Cir. 1994); *Monrad v. F.D.I.C.*, 62 F.3d 1169, 1172 (9th Cir. 1995);

*Hennessy v. F.D.I.C.*, 58 F.3d 908, 920 (3d Cir. 1995)); *see also McCarron v. F.D.I.C.*, 111

F.3d 1089, 1093 (3d Cir. 1997) ("The receiver has broad discretion to determine what is

burdensome, and a court's review of a decision by the FDIC to repudiate is narrowly

circumscribed."); *1185 Ave. of Americas Assocs.*, 22 F.3d at 498 (holding that, under 12

U.S.C. § 1821(e)(1)(B), "whether [a contract] is burdensome is to be decided at the discretion

of the conservator," and "there is no requirement that the conservator or receiver make a

formal finding that a lease or contract is burdensome."); *Howell v. F.D.I.C.*, 986 F.2d 569,

572 (1st Cir. 1993) ("A litigant would normally have an uphill battle in overturning an FDIC

finding of 'burden.'"); *Jenkins-Petre P'ship One v. Resolution Trust Corp.*, 1991 WL

160317, at *5 (D. Colo. Aug. 13, 1991) ("[§ 1821(e)] does not provide that the RTC explain

its actions or that a court may review the basis for that decision.").  Applying the cases that

interpret § 1821(e)(1) to NCUAB's exercise of its authority under § 1787(c)(1), the court

holds that NCUAB was empowered in its broad discretion to repudiate the March 2011

Agreement as burdensome and to promote the orderly administration of TCU's affairs, and

that NCUAB was not required to make formal findings in support of these conclusions.

C

The court now considers Kirkindoll's contention that he is nonetheless entitled to

recover the sum of $234,068.18 as "actual direct compensatory damages" under 12 U.S.C.

§ 1787(c)(3)(A).

Kirkindoll seeks summary judgment under § 1787(c)(3)(A), which provides, in

relevant part, that "the liability of the conservator . . . for the . . . repudiation of any contract pursuant to paragraph (1) shall be . . . limited to actual direct compensatory damages."  12 U.S.C. § 1787(c)(3)(A).  Kirkindoll contends that he suffered actual and direct compensatory damages in the amount of $234,068.18, which represents the sum that the parties agreed would value his rights under the Plan.  He posits that he is entitled to summary judgment establishing his right to recover this sum from NCUAB.

Defendants contend that Kirkindoll cannot recover under § 1787(c)(3)(A) because there could not possibly have been any direct or consequential damages arising out of NCUAB's repudiation of the March 2011 Agreement, given that Kirkindoll never possessed vested Plan benefits; Kirkindoll is asking for an award of damages beyond what the FCUA authorizes; and he is intentionally circumventing the FCUA statutory scheme for recovering repudiation damages by filing suit for money to which he is not entitled under the Plan or the March 2011 Agreement.

Kirkindoll is not entitled to summary judgment awarding him the sum of $234,068.18 as actual direct compensatory damages under 12 U.S.C. § 1787(c)(3)(A) arising from NCUAB's repudiation of the March 2011 Agreement.  This is so because he has not pleaded a claim under § 1787(c)(3)(A), that is, he has not pleaded a claim that rests on the premise that NCUAB lawfully repudiated the March 2011 Agreement and that he is entitled to recover the sum of $234,068.18 as actual direct compensatory damages under § 1787(c)(3)(A).  A movant can neither obtain summary judgment nor avoid the opposing party's summary judgment motion based on an unpleaded claim. *See, e.g., Fershtadt v.*

- 16 -

*Verizon Commc'ns, Inc.*, 2010 WL 571818, at *7 (S.D.N.Y. Feb. 9, 2010) ("But in his motion for summary judgment, plaintiff seeks judgment on unpleaded claims, including a request for civil penalties pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c). Any claims not raised in his complaint, including the 502(c) claim, are not properly before this Court."); *Jacobs v. Tapscott*, 2006 WL 2728827, at *8 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) ("Plaintiffs cannot avoid summary judgment, however, based on unpleaded claims."), *aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008).

D

The court now considers whether Kirkindoll's seven state-law claims regarding the March 2011 Agreement—breach of contract, an alternative claim for estoppel, debts (i.e., money had and received), fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty)—must be dismissed. Each is essentially a claim to recover the sum of $234,068.18, as promised in the March 2011 Agreement.[8]

---

[8]*See, e.g.,* Am. Compl. ¶¶ 4.24-4.26 (alleging that, under the March 2011 Agreement, TCU promised it would pay Kirkindoll the sum of $234,068.18, and defendants breached the contract by failing to pay this amount); *id.* at ¶¶ 4.27-4.31 (alleging that defendants promised they would pay Kirkindoll the sum of $234,068.18, and injustice can only be avoided by enforcing the promise); *id.* at ¶¶ 4.32-4.33 (alleging that by not paying Kirkindoll the sum of $234,068.18, defendants have received money that rightfully belongs to Kirkindoll); *id.* at ¶¶ 4.34-4.42 (alleging that defendants represented to Kirkindoll that he would receive the sum of $234,068.18 in exchange for terminating Plan benefits, and that Kirkindoll relied on these promises to his detriment); *id.* at ¶¶ 4.43-4.44 (alleging that, by not paying Kirkindoll what he was owed under the March 2011 Agreement, defendants breached fiduciary duty owed to Kirkindoll).

1

To the extent Kirkindoll seeks to recover on his state-law claims against NCUAB, as TCU's conservator, the court raises *sua sponte* that these claims are preempted by 12 U.S.C. § 1787(c)(1).[9]  The court can raise a ground for summary judgment *sua sponte*, provided it affords the opposing party notice and a fair opportunity to respond.  *See, e.g., Nunn v. State Farm Mut. Auto. Ins. Co.,* 729 F.Supp.2d 801, 810 (N.D. Tex. 2010) (Fitzwater, C.J.) (citing *Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *9 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.)).  In § VII of this memorandum opinion and order, the court affords Kirkindoll the opportunity to oppose summary judgment on this and other grounds that the court today raises *sua sponte*.

The Supremacy Clause of the Constitution of the United States "invalidates state laws that 'interfere with or are contrary to, the laws of congress.'"  *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981) (quoting *Gibbons v. Ogden*, 6 L. Ed. 23 (1824)).  "[W]hen compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress,'" the state law claim will be barred under the doctrine of conflict preemption.  *California v. ARC Am. Corp.*, 490 U.S. 93, 100-101 (1989) (citations omitted).

---

[9]Defendants contend that "the intention of Plaintiff's seven Texas law claims is precisely that [] unsatisfied with the consequences of NCUAB's exercise of repudiation power as Conservator, he now asks this Court to second-guess those actions and award him damages beyond those authorized by the FCUA." Ds. 6/17/14 Br. 34.  Defendants do not, however, move for summary judgment on this basis as to Kirkindoll's state-law claims regarding the March 2011 Agreement.

Conflict preemption will also be found where "state law . . . interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).  In *Resolution Trust Corp. v. Diamond*, 45 F.3d 665 (2d Cir. 1995), for example, the Second Circuit discussed 12 U.S.C. § 1821(e)(1),[10] which is identical in all material respects to § 1787(c)(1).  *Diamond* held that the RTC's federally-granted power to repudiate a contract or lease under § 1821(e)(1) precluded parties to the repudiated lease from exercising rights under New York's rent regulations that would conflict with the goals of FIRREA.  *Diamond*, 45 F.3d at 675.  The court explained:

> The goal of FIRREA is to stem the "financial hemorrhaging" resulting from the large number of failures in the thrift industry. To that end, "Congress required that RTC conduct its operations 'in a manner which [] maximizes the net present value return from the sale or other deposition of' thrift assets that come into

---

[10]Section 1821(e)(1), entitled "Authority to repudiate contracts," provides:

> In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
>
> (A) to which such institution is a party;
>
> (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
>
> (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

12 U.S.C. § 1821(e)(1).

its hands." It is pursuant to this overarching mandate that "Congress armed [RTC] with the power to disaffirm or repudiate contracts or leases that RTC in its discretion determines to be burdensome." . . . Therefore, the entire purpose underlying RTC's repudiation power is the maximization of return on assets. To that end, Congress conferred on the RTC power to repudiate leases it deems burdensome. Here, the burden is the regulated rent and the diminished asset value that the rent-regulation causes. A state law that obliged the RTC to accept the tenancy in exchange for the regulated rent payment would simply continue the (repudiated) leasehold subject to the same burden. It is obvious that this state of affairs would nullify the FIRREA power to repudiate burdensome leases.

*Id.* at 674-75 (citations omitted).

In the present case, each of Kirkindoll's seven state-law claims against NCUAB seeks to recover the sum of $234,068.18 promised in the March 2011 Agreement, and each therefore directly interferes with NCUAB's statutory power to repudiate the contract, in derogation of the "accomplishment and execution of the full purposes and objectives of Congress." *ARC Am. Corp.*, 490 U.S. at 100-101. Regardless whether Kirkindoll could recover this sum as actual direct compensatory damages under § 1787(c)(3)(A)—a claim that is not asserted—if Kirkindoll were permitted to recover from NCUAB on a state-law theory, NCUAB's repudiation power would be rendered feckless. A conservator of an insured credit union would no longer have broad discretion to repudiate burdensome contracts, because doing so could subject it to liability under state law.

The court therefore raises *sua sponte* that NCUAB as conservator is entitled to summary judgment dismissing Kirkindoll's seven state-law claims "regarding the March 2011 Agreement" on the ground that they are preempted by the FCUA.

2

The court now considers whether Kirkindoll's state-law claims against Texans, Texans Partners, and TIG regarding the March 2011 Agreement should be dismissed.[11]

The court raises *sua sponte* that Kirkindoll has failed to adduce any evidence that Texans, Texans Partners, or TIG was in privity of contract with Kirkindoll or made any promise to pay Kirkindoll. The March 2011 Agreement was signed by Sauer, as President and CEO of TCU, and refers only to "the Company," defined as TCU. The contract nowhere mentions any obligation or promise of Texans, Texans Partners, or TIG. It is axiomatic that to recover for breach of contract under Texas law, "the plaintiff must either be in privity of contract with the defendant or be a third-party beneficiary entitled to enforce the contract." *Allan v. Nersesova*, 307 S.W.3d 564, 571 (Tex. App. 2010, no pet.) (citing *O.A.I.C. Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 738 (Tex. App. 2007, pet. denied)). "Privity of contract is established by proving that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff." *Id.* There is simply no evidence in the summary judgment records that Texans, Texans Partners, or TIG was in privity of contract with Kirkindoll with respect to the March 2011 Agreement.

As for Kirkindoll's other six state-law claims, the court raises *sua sponte* that the

---

[11]In doing so, the court assumes that these claims are viable despite the undisputed fact that performance under the March 2011 Agreement was legally prevented by NCUAB's exercise of its power as TCU's conservator to repudiate the contract.

summary judgment record is devoid of evidence that any of these three entities promised Kirkindoll that he would receive $234,068.18 if he terminated the Plan (which is necessary for his promissory estoppel claim), have money that rightfully belongs to Kirkindoll (which is necessary for his debts claim), made the misrepresentation (fraudulently or negligently) that it (or TCU) would pay Kirkindoll $234,068.18 in exchange for his surrender and cancellation of any rights in the Plan (which is necessary for his fraudulent misrepresentation, negligent misrepresentation, and fraudulent inducement claims), or had a fiduciary relationship with him by virtue of the March 2011 Agreement (which is necessary for his breach of fiduciary duty claim).   The court therefore raises *sua sponte* that Kirkindoll's state-law claims against Texans, Texans Partners, and TIG regarding the March 2011 Agreement must be dismissed.

Accordingly, Kirkindoll's motion for summary judgment is denied to the extent he seeks relief on his state-law claims regarding the March 2011 Agreement, defendants' motion for summary judgment is granted in part, and the court raises *sua sponte* that defendants are entitled to summary judgment dismissing the balance of Kirkindoll's state-law claims regarding the March 2011 Agreement.

V

Kirkindoll alleges the same seven state-law claims regarding the Plan and also asserts an alternative ERISA § 502(a) claim.   The court now considers the parties' cross-motions concerning these claims.

- 22 -

A

Kirkindoll maintains that he is entitled to summary judgment on his ERISA claim awarding him the sum of $1,890,025.49 under the Plan.  He contends that "top hat" ERISA plans like this one are treated as unilateral contracts; that because he accepted TCU's offer of a unilateral contract and performed under it, he is entitled to receive the benefits promised under the Plan; and that his acceptance of the Plan through performance (i.e., his continued employment) prohibits TCU from terminating the Plan because TCU did not specifically reserve that right.  To the extent NCUAB repudiated the March 2011 Agreement, Kirkindoll contends that it repudiated the entire agreement, thereby voiding the termination of the Plan and restoring him to his rights under the Plan.  Kirkindoll also posits that the appointment of NCUAB as TCU's conservator was a "change in control" that vested his interest in the Plan, and, alternatively, that his interest in the Plan vested when his employment was terminated.  He therefore contends that he is entitled to summary judgment under ERISA for Plan benefits in the amount of $1,890,025.49.

Defendants move for summary judgment dismissing Kirkindoll's ERISA claim.  They contend in their motion and in response to Kirkindoll's motion that, under the Plan, the Compensation Committee of the TCU Board of Directors, as Plan Administrator, was permitted to terminate the Plan at any time, and, upon termination, only vested benefits were payable to a participant.  Defendants maintain that Kirkindoll had no vested benefits as of the April 1, 2011 termination of the Plan, so he is not entitled to recover under the Plan.  They posit that, to the extent NCUAB's repudiation of the March 2011 Agreement restored

- 23 -

Kirkindoll's rights in the Plan, his interest in the Plan did not vest when he was terminated because his separation from employment did not occur until May 23, 2011, after the Plan was terminated on April 1, 2011.  Defendants maintain that Kirkindoll's interest in the Plan did not vest when TCU was placed into conservatorship because this did not qualify as a "change in control."  And they argue in the alternative that Kirkindoll's claim for ERISA plan benefits fails because he did not exhaust administrative prerequisites to suit, including the requirements of mandatory claims procedures that include binding arbitration.

B

The court raises *sua sponte* that defendants are entitled to summary judgment dismissing Kirkindoll's ERISA claim because the FCUA's statutory scheme does not permit Kirkindoll to "revive" the Plan as a result of NCUAB's repudiation of the March 2011 Agreement and recover the type of damages that Plan benefits would represent.

Section 1787(c)(3)(A) limits a party to a repudiated contract to a recovery of "actual direct compensatory damages."  Courts interpreting the nearly identical language in FIRREA have held that by allowing "actual direct compensatory damages," and specifically excluding, *inter alia*, "damages for lost profits or opportunity,"[12] "Congress appears . . . to have wished to distinguish between those damages which can be thought to make one whole and those that are designed to go somewhat further and put a plaintiff securely in a financial position he or she would have occupied but for the breach."  *Office & Prof'l Emps. Int'l Union, Local*

---

[12]The FCUA contains this same exclusion.  *See* 12 U.S.C. § 1787(c)(3)(B).

*2 v. F.D.I.C.*, 27 F.3d 598, 604 (D.C. Cir. 1994); *see also ALLTEL Info. Servs., Inc. v. F.D.I.C.*, 194 F.3d 1036, 1041 (9th Cir. 1999) (holding that "the ascertainable nature of ALLTEL's future profits does not render them recoverable because, rather than making ALLTEL whole, they would put ALLTEL in the financial position it would have occupied but for the breach. By contrast, the claim for the outstanding accounts receivable balance, allowed by the FDIC, constituted compensation already earned and thus is recoverable."); *McMillian v. F.D.I.C.*, 81 F.3d 1041, 1055 (11th Cir. 1996) (holding that "'actual direct compensatory damages' appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation." (citations omitted)).  In fact, if a party to a repudiated contract could recover more than actual direct compensatory damages—for example, if a party could show that the repudiation of one contract revived another contract and somehow resulted in additional damages—a conservator seeking to promote the orderly administration of a failed insured credit union would be unable to fully exercise its broad discretion to repudiate burdensome contracts. This is so because it would first be necessary for the conservator to analyze and anticipate the legal effect that repudiation could have on known (and possibly unknown) contracts, and the potential magnitude of the resulting damages recoverable under such a contract.  And repudiation of one contract as burdensome could conceivably revive an even more burdensome contract.  Accordingly, the court raises *sua sponte* that Kirkindoll's ERISA claim under the Plan must be dismissed because he agreed to terminate any rights that he had

under the Plan, and when NCUAB repudiated the March 2011 Agreement, this entitled him

to seek only the relief available under § 1787(c)(3)(A), not Plan benefits.

At oral argument, Kirkindoll asserted that NCUAB's repudiation of the March 2011

Agreement restored him to the position he held, and that the rights he had on March 15,

2011, including the right to resign his employment for "good reason," and on that basis to

seek $1,890,025.49 in vested benefits under the Plan.  There are fundamental problems with

this contention.

First, awarding Kirkindoll the sum of $1,890,025.49 in Plan benefits would go far

beyond making him whole as a result of NCUAB's repudiation.  In fact, it would grant him

greater rights than he otherwise had.  Kirkindoll had no vested right to Plan benefits when

he signed the March 2011 Agreement, and the agreement extinguished any rights that he did

have in the Plan.  If Kirkindoll were now awarded the sum of $1,890,025.49 in Plan benefits

because NCUAB repudiated the March 2011 Agreement, the act of repudiation would confer

on him greater relief than he would have been entitled to under the Plan and greater than the

actual direct compensatory damages available by statute.  Moreover, as the court has

explained above, awarding him full Plan benefits would have undesirable consequences for

conservators of insured credit unions, like NCUAB, by severely hampering their broad

discretion.  In this case, it would saddle the conservatorship with a larger financial burden

than the one found in the March 2011 Agreement that NCUAB repudiated as burdensome.

The "entire purpose underlying [NCUAB's] repudiation power is the maximization of return

on assets." *Diamond*, 45 F.3d at 675.  Adopting Kirkindoll's argument would undermine this

purpose.

Second, the possibility that Kirkindoll can now take steps to vest his Plan benefits is predicated on a series of speculative and unsupportable assumptions. Kirkindoll contends that, when NCUAB repudiated the March 2011 Agreement, it repudiated the entire agreement, thus placing him back in the position he was in on March 14, 2011, before he signed the March 2011 Agreement. He maintains that he could now resign, thereby entitling him to recover Plan benefits. But benefits vest under the Plan when an employee resigns for "Good Reason." P. 6/28/12 App. 19.[13] Kirkindoll has adduced no evidence, other than his

---

[13]Under the Plan

> "Good Reason" means, with respect to a Participant and except as otherwise set forth in a Participation Agreement, any of the following events, without the consent of the Participant:
>
> (i) a material diminution in the Participant's base compensation other than a reduction in connection with a broad-based reduction of management compensation;
>
> (ii) a material diminution in the Participant's authority, duties, or responsibilities; or
>
> (iii) a material change in the geographic location at which the Participant must perform services. In connection with each Participant's employment by the Employer, his principal business address shall be at the Company's principal executive offices to be located in Richardson, Texas.
>
> A participant is required to provide notice to the Employer of the existence of a condition described above in this Section . . . within a period not to exceed 90 calendar days from the initial existence of the condition, upon the notice of which the Employer must be provided a period of at least 30 calendar days

own speculation, that had he resigned on March 14, 2011 before the Plan terminated, he would have met the "Good Reason" requirement. *See, e.g., Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (holding that "'conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment." (quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996))).  Nor is there any basis to conclude that, had Kirkindoll resigned rather than sign the March 2011 Agreement, TCU would have been unable to remedy within 30 days the "condition" that caused Kirkindoll's resignation, as permitted under the Plan. *See id.*

C

Even if defendants are not entitled to summary judgment dismissing Kirkindoll's ERISA claim for Plan benefits on any other ground, they are entitled to this relief based on Kirkindoll's failure to exhaust his administrative remedies under the Plan.[14]

---

during which it may remedy the condition.

P. 6/28/12 App. 17 (bold font omitted).

[14]Defendants argue in their reply brief that, "[a]lthough Plaintiff purports to bring ERISA claims against multiple Defendants, with the *possible* exception of Texans Credit Union (whose Compensation Committee of its Board of Directors served as Plan Administrator), none of the remaining Defendants are proper parties to ERISA claims made herein." Ds. 8/7/14 Reply Br. 5.  Because defendants raised this argument for the first time in their reply brief, and because the court is granting summary judgment on other grounds, the court does not address whether any specific defendant is a proper party to Kirkindoll's ERISA claim.  The court assumes *arguendo* that Kirkindoll has sued at least one proper party. *See LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 845 (5th Cir. 2013) (holding that "'[t]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan.'" (quoting *Gomez-Gonzalez v. Rural Opportunities, Inc.*, 626 F.3d 654, 665 (1st Cir. 2010)).

"[C]laimants seeking benefits from an ERISA plan must first exhaust available administrative remedies under the plan before bringing suit to recover benefits under § [502(a)]." *Gonzalez v. Aztex Advantage*, 547 Fed. Appx. 424, 427-28 (5th Cir. 2013) (per curiam) (quoting *Bourgeois v. Pension Plan for Emp. of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000)) (internal quotation marks omitted).  Because exhaustion of remedies is an affirmative defense, *see Crowell v. Shell Oil Co.*, 541 F.3d 295, 308-09 (5th Cir. 2008), defendants will have the burden of proof.  They must therefore establish beyond peradventure that Kirkindoll has failed to exhaust his administrative remedies.

The Plan provides specific procedures for making a claim for benefits.  First, "[a]ny person claiming benefits, eligibility, participation or any other right or benefit under the Plan must file a written claim, setting forth the basis of the claim, with the Plan Administrator." P. 6/28/12 App. 24.  If a claim is denied, the Plan Administrator must provide notice to the claimant that includes, *inter alia*, "a statement of the claimant's right to bring a civil action under section 502(a) of ERISA *following an adverse benefit determination on review*." *Id.* at 25 (emphasis added).  When a claim is denied, "within sixty (60) days after receiving the written notice of the Plan Administrator's disposition of the claim, the claimant may request the Plan Administrator to review his claim." *Id.* at 25.  A request for review must be in writing and must set forth reasons why the claim should be allowed.  If a claim is denied on review, the written notice provided to a claimant must set forth, *inter alia*, "a statement of the claimant's right to bring a civil action under section 502(a) of ERISA." *Id.*  The Plan thus contemplates a two-tiered process for making a claim for benefits before Plan

- 29 -

participants are permitted to seek a judicial remedy under ERISA.

It is undisputed that Kirkindoll neither filed a claim for benefits under the Plan nor requested review of a denial of benefits under the Plan. Kirkindoll contends that he "notified NCUAB that [he] would be pursuing a claim against Defendants" and "did not receive a response." P. 7/17/14 Br. 20. But it is undisputed that he did not follow the Plan procedures for claims for benefits. Essentially, he decided to bring this lawsuit in state court based on state-law theories. He did not add an ERISA claim until after the lawsuit was removed.

Kirkindoll contends that, because he notified NCUAB that he would be pursuing a claim but received no response, and because NCUAB repudiated the March 2011 Agreement, it would have been futile to participate in the administrative claims process. Although under certain circumstances an ERISA plaintiff is not required to exhaust plan remedies if doing so would be futile, *see, e.g., Bourgeois*, 215 F.3d at 479, futility requires a showing of "hostility or bias" on the part of the plan administrator. *McGowin v. ManPower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004) ("A failure to show hostility or bias on the part of the administrative review committee is fatal to a claim of futility."); *see also Gonzalez*, 547 Fed. Appx. at 428 (affirming summary judgment where claimant failed to provide evidence that committee was "hostile or bitter" toward him and thus could not show that his failure to exhaust procedural remedies should be excused). Kirkindoll has neither adduced evidence nor argued that the Plan Administrator was hostile or biased.

If, as Kirkindoll maintains, NCUAB's repudiation of the March 2011 Agreement also had the effect of voiding the April 1, 2011 termination of the Plan and entitled Kirkindoll to

make a claim for Plan benefits, the Plan required that he submit a claim for benefits under the Plan, and, if the claim was denied, request review of the denial by the Plan Administrator. It is undisputed that Kirkindoll did neither. Accordingly, defendants have established beyond peradventure that Kirkindoll failed to exhaust his administrative remedies as required by ERISA, and they are entitled to summary judgment dismissing Kirkindoll's ERISA claim on this basis as well.

Defendants are entitled to summary judgment dismissing Kirkindoll's ERISA claim on an exhaustion ground that they have raised and on a ground that the court raises *sua sponte*.[15] Kirkindoll's motion for summary judgment based on his ERISA claim is denied.

## VI

The court now turns to Kirkindoll's seven state-law claims "regarding the Plan."

### A

Kirkindoll seeks to recover on claims for breach of contract, an alternative claim for promissory estoppel, debts (i.e., money had and received), fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty. Defendants contend that they are entitled to summary judgment dismissing these claims

---

[15]Defendants have moved for summary judgment based on Kirkindoll's failure to exhaust administrative remedies, as required by ERISA. *See* Ds. 6/17/14 Br. 2 ("And finally, Plaintiff's claim for ERISA plan benefits is also flawed because he admittedly (and purposely) failed to exhaust administrative prerequisites to suit, including requirements for following mandatory claims procedures that include binding arbitration. Accordingly, the ERISA benefit claims he makes can be dismissed for that alternative and independent reason.").

because Kirkindoll "simply seeks the dollars that were in his account before the Plan was terminated," Ds. 6/17/14 Br. 21, and none of his state-law causes of action is independent of ERISA plan rights.

Kirkindoll responds that his claims for fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation regarding the Plan are not preempted by ERISA because they arise from conduct that occurred before he decided to participate in the Plan, or to ensure the continuation of an ERISA-type relationship, and that his claim for promissory estoppel is not preempted because the Third Circuit in *In re New Valley Corp.*, 89 F.3d 143, 152 (3d Cir. 1996), recognized the availability of promissory estoppel claims against top hat plans.

B

The court holds that Kirkindoll's claims for fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation are not completely preempted because they do not seek to recover benefits, enforce rights, or clarify rights to future benefits under the terms of the Plan, and therefore could not have been brought under § 502(a)(1)(B). *See, e.g., Westfall v. Bevan*, 2009 WL 111577, at *4-5 (N.D. Tex. Jan. 15, 2009) (Fitzwater, C.J.). Rather, the gravamen of these three claims is that defendants[16] represented to Kirkindoll

---

[16]Kirkindoll sues NCUAB for conduct that TCU allegedly committed before NCUAB was appointed as TCU's conservator. Because the issue is not adequately presented in the briefing and it is not clear that there is a basis to raise summary judgment *sua sponte*, the court assumes that Kirkindoll can directly sue NCUAB as conservator for alleged pre-conservatorship torts of TCU. For example, the court assumes that Kirkindoll need not pursue an administrative claim, as in the case of a claim against a liquidated credit union that

(either negligently or fraudulently) that he would receive Plan proceeds upon his termination, and, relying on these representations, Kirkindoll continued working for TCU, to his detriment.[17]   The alleged misrepresentations occurred before Kirkindoll accepted the Plan and do not implicate the administration, interpretation, or recovery of benefits under the Plan, or relate to a violation of the Plan's terms.   *See Patel v. Sea Nine Assocs., Inc.*, 2014 WL

---

NCUAB as liquidating agent would review administratively.   *See Branum v. Nat'l Credit Union Admin. Bd.,* 2013 WL 5309125, at *3 (S.D. Miss. 2013) (citing 12 U.S.C. § 1787(b)(3), and holding that it allows NCUAB to review claims against liquidated credit unions and determine whether they should be allowed or disallowed).

[17]In support of his fraudulent misrepresentation claim, Kirkindoll alleges the following:

> 4.12   Defendants materially represented to Plaintiff Gary Kirkindoll that he would be compensated under the Plan upon Mr. Kirkindoll's termination or retirement age as long as Mr. Kirkindoll continued working for Defendants.

> 4.13   Plaintiff Gary Kirkindoll accepted Defendants' offer to be included under the Plan based on the material representations by Defendants.   Believing he would [be] compensated under the Plan, Mr. Kirkindoll relied on this representation by Defendants to his detriment because he continued working for Defendants so that he would be compensated under the Plan.   Mr. Kirkindoll only continued working for the Defendants because he believed he would ultimately be compensated under the Plan.

> 4.14   Defendants fraudulently misrepresented their position by making representations to Plaintiff knowing such representations were false and knowing that Plaintiff would rely on such representations to his detriment.

2d Am. Compl. ¶¶ 4.12-4.14.   Kirkindoll's negligent misrepresentation and fraudulent inducement claims are based on similar allegations.   *See id.* at ¶¶ 4.15-4.20.

1976882, at *6 (N.D. Tex. May 15, 2014) (Boyle, J.) (holding there was no ERISA preemption where "the gravamen of the Petition is fraudulent inducement to enter into the [ERISA] plan"); *see also Hobson v. Robinson*, 75 Fed. Appx. 949, 955-56 (5th Cir. 2003) (holding that fraudulent inducement claims were not preempted because they "d[id] not require interpretation or administration of the ERISA plan" and thus related "only indirectly to the ERISA plan"); *Westfall*, 2009 WL 111577, at *5 ("[Plaintiffs'] claims do not depend on, or even implicate, the [Plan's] terms or its status as an ERISA plan. The claims would exist with respect to any type of an investment—not just an ERISA plan—because they rest on independent statutory and common-law duties that proscribe misrepresentation in various forms. Therefore, they are not preempted under § 502(a)(1)(B)."). Thus without a more direct connection to the Plan or TCU's duties under ERISA, the claims are neither "intricately bound with an ERISA plan," *Hobson*, 75 Fed. Appx. at 955, nor do they "duplicat[e], supplemen[t], or supplan[t] the ERISA civil enforcement remedy," *Davila*, 542 U.S. at 209, and therefore do not address an area of exclusive federal concern.[18]

Because defendants do not move for summary judgment on Kirkindoll's claims for fraudulent misrepresentation, negligent misrepresentation, or fraudulent inducement on any

---

[18]In their reply brief and at oral argument, defendants asserted that Kirkindoll's state-law claims related to the Plan are preempted because "the very *formula* Plaintiff uses to calculate alleged damages stems from a single root—Plan benefits." Ds. 8/7/14 Reply 3. But the court cannot conclude on the summary judgment record that the calculation of Kirkindoll's damages claims for fraudulent misrepresentation, negligent misrepresentation, or fraudulent inducement are measured according to the Plan benefits and no other measure of damages.

grounds other than ERISA preemption, and because there is no clear basis on which the court should raise summary judgment *sua sponte*, the court denies their motion as to these claims.

## C

The court reaches a different result, however, concerning Kirkindoll's alternative claim for promissory estoppel. Kirkindoll alleges that defendants promised "that he would be deferred compensation for his future services and substantial services for Defendants," 2d Am. Compl. ¶ 4.05, and that "[o]nly if Defendants' promises are enforced can injustice to [Kirkindoll] be avoided," *id.* at ¶ 4.08. This is an attempt to obtain Plan benefits through a promissory estoppel claim. Where, as here, a claim of estoppel "addresses [plaintiff's] right to receive benefits under the terms of an ERISA plan," it is preempted under ERISA. *See, e.g., McNeil v. Time Ins. Co.*, 205 F.3d 179, 191 (5th Cir. 2000) (holding that state-law claims, including claim for estoppel, were preempted under ERISA because "[e]ach claim addresses [plaintiff's] right to receive benefits under the terms of an ERISA plan"); *see also Degan v. Ford Motor Co.*, 869 F.2d 889, 895 (5th Cir. 1989) (holding that "claims of promissory estoppel are not cognizable in suits seeking to enforce rights to pension benefits [under an ERISA plan].").

## D

Defendants are also entitled to summary judgment dismissing Kirkindoll's claims for breach of contract, debts, and breach of fiduciary duty. Kirkindoll's breach of contract claim alleges that defendants breached the terms of the Plan by failing to pay him Plan benefits he was owed; his claim for debts alleges that defendants are liable for not paying him what he

was due under the Plan; and his claim for breach of fiduciary duty alleges that defendants

breached their fiduciary duties by not paying him what he was owed under the Plan.  All

three claims are therefore "brought . . . by a participant or beneficiary . . . to recover benefits

due to him under the terms of his plan [or] to enforce his rights under the terms of the plan."

29 U.S.C. § 1132(a)(1)(B).

"If plaintiffs are seeking assigned ERISA benefits, they are not suing on an

independent basis and 'must proceed under the procedures established by § 502(a)' because

they '[are] seeking to enforce the terms of the plan.'"  *Paragon Office Servs., LLC v.*

*UnitedHealthGroup, Inc.*, 2012 WL 1019953, at *6 (N.D. Tex. Mar. 27, 2012) (Fitzwater,

C.J.) (quoting *Lone Star Ob/Gyn Assocs. v. Aetna Health Inc*., 579 F.3d 525, 529 n.3 (5th

Cir. 2009)).   These claims are therefore completely preempted under ERISA and are

dismissed.

### E

Accordingly, the court denies Kirkindoll's motion for summary judgment establishing

his claims regarding the Plan, and it grants in part and denies in part defendants' motion for

summary judgment and in part raises summary judgment *sua sponte* concerning Kirkindoll's

claims regarding the Plan

### VII

Because the court has raised *sua sponte* certain grounds for granting summary

judgment, it grants Kirkindoll leave to file an opposition response, brief, and appendix within

28 days of the date this memorandum opinion and order is filed.  The court will evaluate

Kirkindoll's papers before deciding whether to invite defendants to file a reply brief.

\*   \*   \*

For the reasons explained, the court denies Kirkindoll's motion for summary judgment; it grants in part and denies in part defendants' motion for summary judgment; and it raises *sua sponte* that defendants are entitled to summary judgment on grounds that they do not raise.  The court grants Kirkindoll 28 days from the date this memorandum opinion and order is filed to file an opposition response, brief, and appendix that addresses the grounds on which the court has raised summary judgment *sua sponte*.  The three state-law claims that remain for trial are not subject to dismissal on a ground raised *sua sponte*, and plaintiff need not address them.

**SO ORDERED**.

December 17, 2014

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE