IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GARY KIRKINDOLL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:11-CV-1921-D |
| VS. | § | |
| | § | |
| NATIONAL CREDIT UNION | § | |
| ADMINISTRATIVE BOARD, AS | § | |
| CONSERVATOR OF TEXANS | § | |
| CREDIT UNION, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
AND ORDER

In its prior memorandum opinion and order in this case, *Kirkindoll v. NCUAB*, 2014

WL 7178005 (N.D. Tex. Dec. 17, 2014) (Fitzwater, J.) ("*Kirkindoll V*"), the court raised *sua*

*sponte* that defendants are entitled to summary judgment dismissing plaintiff's breach of

contract claim, and it gave plaintiff an opportunity to respond.  The court later granted

defendants leave to file a summary judgment motion addressed to plaintiff's other remaining

claims.  For the reasons that follow, the court concludes that neither plaintiff Gary Kirkindoll

("Kirkindoll") nor defendant National Credit Union Administration Board ("NCUAB") is

entitled to summary judgment on Kirkindoll's breach of contract claim, but that the other

defendants are entitled to summary judgment dismissing that claim; that defendants are

entitled to summary judgment dismissing Kirkindoll's other remaining claims; and that

Kirkindoll's breach of contract claim against NCUAB, limited to the relief available under

12 U.S.C. § 1787(c)(3), is the only claim that remains for trial.  The court today enters a Fed. R. Civ. P. 54(b) final judgment dismissing Kirkindoll's actions against all defendants except NCUAB.

I

Because this case is the subject of several prior memorandum opinions and orders, including *Kirkindoll V*, the court will limit its discussion of the background facts and procedural history to what is pertinent to this decision.[1]

Kirkindoll was hired in 2005 as President of defendant Texans CUSO Services, LLC d/b/a Texans Financial ("Texans"), a credit union service organization owned by defendant Texans Credit Union ("TCU").  As a tool to retain certain key company executives, TCU created and implemented the Texans Credit Union Section 457(f) Executive Deferred Compensation Plan ("Plan")—a "top hat" plan—which was offered to Kirkindoll and two other TCU executives.

In 2010, after TCU began experiencing severe financial distress, its Board of Directors decided to terminate the Plan.  In March 2011 TCU's then-President and Chief Executive Officer, Mike Sauer ("Sauer"), proposed to Kirkindoll that his interest in the Plan be partially vested in exchange for Kirkindoll's surrender and cancellation of any rights he had under the

---

[1]Because both parties move for summary judgment, the court will recount the evidence that is undisputed, and, when necessary to set out evidence that is contested, will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (citing *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

Plan.  In a March 15, 2011 letter (the "March 2011 Agreement"), Sauer proposed that the Plan terminate on April 1, 2011 and that Kirkindoll receive $234,068.18 within 30 days. Kirkindoll signed the March 2011 Agreement, and, by unanimous consent, the Board of Directors terminated the Plan effective April 1, 2011.

On April 15, 2011 NCUAB placed TCU into conservatorship and appointed itself as conservator.  NCUAB notified Kirkindoll in a May 11, 2011 letter (the "Repudiation Letter") that, in accordance with its federal regulatory powers, it was repudiating the March 2011 Agreement.  It cited, among other reasons, that the TCU Board of Directors had acted outside its allowable authority in purporting to partially vest Kirkindoll's account, and that continuation of the March 2011 Agreement would be burdensome and hinder the orderly administration of TCU's affairs.  The Repudiation Letter also stated, in relevant part:

> [NCUAB] as Conservator is not liable for damages for the repudiation of a contract, 12 U.S.C. § 1787(c)(3), except for certain actual and direct compensatory damages.  Damages are determined from the date of the appointment of the Conservator and may not include punitive damages, damages for lost profits or opportunity, or damages for pain and suffering.  Please direct any inquiries regarding actual and direct damages to [name of contact person] at [telephone number of contact person].

P. 6/28/12 App. 65.  Kirkindoll neither telephoned nor otherwise contacted NCUAB.

On May 18, 2011 NCUAB adopted a resolution ratifying the TCU Board of Directors' termination of the Plan and nullifying any payments that had been made to Kirkindoll.  On May 23, 2011 Kirkindoll's employment was terminated as part of a reduction in force.

Kirkindoll filed the instant lawsuit in Texas state court against TCU, Texans, Texans

- 3 -

CUSO Partners, LLC ("Texans Partners"), and Texans CUSO Insurance Group, LLC ("TIG").[2]  He asserted state-law claims for breach of contract, promissory estoppel, debts, fraudulent misrepresentation, negligent misrepresentation, fraudulent inducement, and breach of fiduciary duty.  Defendants removed the case to this court, and on defendants' unopposed motion, the court ordered that NCUAB be substituted in place of TCU as a defendant.  After the court denied Kirkindoll's motion to remand based on NCUAB's status as a party-defendant, he amended his complaint to add an alternative claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").[3]

In *Kirkindoll V* the court denied Kirkindoll's motion for summary judgment, granted in part and denied in part defendants' motion for summary judgment, and raised *sua sponte* that summary judgment should be granted in defendants' favor on certain grounds. *Kirkindoll V*, 2014 WL 7178005, at *15.[4]  Because the court raised grounds for summary judgment *sua sponte*, it permitted Kirkindoll to file an opposition response addressing these grounds.  *Id.*  The court separately granted defendants' motion for leave to file a motion for

---

[2]Texans Partners and TIG are credit union service organizations owned in whole or in part by TCU.

[3]On October 23, 2012 Kirkindoll filed a second amended complaint alleging an ERISA claim, seven state-law claims "Regarding the Plan," and seven state-law claims "Regarding the March 2011 Agreement."

[4]The result of *Kirkindoll V* was that, subject to Kirkindoll's filing an opposition response to summary judgment grounds that the court had raised *sua sponte*, all of Kirkindoll's claims were dismissed except for his state-law claims for fraudulent misrepresentation, negligent misrepresentation, and fraudulent inducement based on representations made before he accepted the Plan.  *See Kirkindoll V*, 2014 WL 7178005, at *15.

summary judgment directed to Kirkindoll's three remaining state-law claims. Kirkindoll has filed his response to *Kirkindoll V*,[5] and defendants have filed their summary judgment motion.

## II

The court turns first to Kirkindoll's breach of contract claim. It considers initially whether Kirkindoll has pleaded such a claim, and, if he has, whether he is entitled to summary judgment establishing this claim, or whether defendants are entitled to summary judgment dismissing this claim.

## A

In *Kirkindoll V* the court addressed Kirkindoll's and defendants' summary judgment motions concerning Kirkindoll's breach of contract claim. The court denied Kirkindoll's motion on the ground that NCUAB could not have breached the March 2011 Agreement by exercising its statutory authority under 12 U.S.C. § 1787(c)(1) to repudiate the contract. *Id.* at *6 ("[T]he court holds that NCUAB was empowered in its broad discretion to repudiate the March 2011 Agreement as burdensome and to promote the orderly administration of TCU's affairs[.]"). The court then held that Kirkindoll was not entitled to summary judgment in his favor—awarding him the sum of $234,068.18 as actual direct compensatory damages

---

[5]Kirkindoll has also filed a motion for leave to file a third amended complaint to clarify that he seeks actual compensatory damages under 12 U.S.C. § 1787(c)(3) as a remedy for his breach of contract claim. Because the court concludes that Kirkindoll has adequately pleaded this claim in his second amended complaint, it denies as moot his motion for leave to file a third amended complaint.

under 12 U.S.C. § 1787(c)(3)(A) arising from NCUAB's repudiation of the March 2011 Agreement—because he had not pleaded a claim under § 1787(c)(3)(A). *Id.* The court concluded that Kirkindoll "ha[d] not pleaded a claim that rests on the premise that NCUAB lawfully repudiated the March 2011 Agreement and that he is entitled to recover the sum of $234,068.18 as actual direct compensatory damages under § 1787(c)(3)(A)." *Id.* at *7.

Regarding whether defendants were entitled to summary judgment dismissing Kirkindoll's breach of contract claim against NCUAB, the court raised *sua sponte* that this claim (among other state-law claims) was preempted by 12 U.S.C. § 1787(c)(1). *Id.* The court dismissed Kirkindoll's state-law breach of contract claim against NCUAB in its entirety, without deciding whether Kirkindoll could recover the same relief as actual direct compensatory damages under § 1787(c)(3)(A), on the ground that he had not asserted such a claim. *Id.* at *8. The court raised *sua sponte* that Texans, Texans Partners, and TIG were entitled to summary judgment dismissing Kirkindoll's breach of contract claim because he had failed to adduce any evidence that they were in privity of contract with him. *Id.* at *9.

B

The court holds that Kirkindoll has failed to present a basis for a reasonable jury to find that Texans, Texans Partners, and TIG were in privity of contract with Kirkindoll. Accordingly, Texans, Texans Partners, and TIG are entitled to summary judgment dismissing Kirkindoll's claim for breach of contract.

- 6 -

C

The court considers next whether Kirkindoll has pleaded a breach of contract claim against NCUAB.

Kirkindoll maintains that he has a breach of contract claim based on NCUAB's repudiation of the March 2011 Agreement, despite the limitation on available remedies imposed by 12 U.S.C. § 1787(c)(3)(A).  In response to the court's conclusion in *Kirkindoll V* that he has not pleaded such a claim, Kirkindoll contends that "the Court should reconsider its determination that Kirkindoll cannot recover under the March 2011 Contract on the ground that Kirkindoll *did not cite* 12 U.S.C. § 1787(c)(3)(A)."  P. 1/14/15 Br. 3 (emphasis added).  He argues that the United States Supreme Court's recent decision in *Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S.Ct. 346 (2014) (per curiam), "makes clear that the Federal Rules of Civil Procedure do not require [him] to cite a statute, to articulate the statute or authority to make a claim."  P. 1/14/15 Br. at 4.[6]

Although Kirkindoll correctly reads *Johnson*, he misapplies it to the court's decision in *Kirkindoll V*.  In *Kirkindoll V* the court rejected Kirkindoll's assertion that, even if he could not recover for breach of contract, "he [was] nonetheless entitled to recover the sum of $234,068.18 as 'actual direct compensatory damages' under 12 U.S.C. § 1787(c)(3)(A)." *Kirkindoll V*, 2014 WL 7178005, at *6.  The court explained that

---

[6]Kirkindoll also moves for leave to amend to assert a claim under 12 U.S.C. § 1787(c)(3)(A).  *See supra* note 5.

- 7 -

> Kirkindoll is not entitled to summary judgment awarding him the sum of $234,068.18 as actual direct compensatory damages under 12 U.S.C. § 1787(c)(3)(A) arising from NCUAB's repudiation of the March 2011 Agreement.  This is so because he has not pleaded a claim under § 1787(c)(3)(A), that is, he has not pleaded a claim that rests on the premise that NCUAB lawfully repudiated the March 2011 Agreement and that he is entitled to recover the sum of $234,068.18 as actual direct compensatory damages under § 1787(c)(3)(A).

*Id.* at *7.  The court did not base its holding on Kirkindoll's failure *to cite* § 1787(c)(3)(A).  The court clearly explained that Kirkindoll had "not pleaded a claim *that rests on the premise that NCUAB lawfully repudiated the March 2011 Agreement and that he is entitled to recover the sum of $234,068.18 as actual direct compensatory damages under § 1787(c)(3)(A)*."  *Id.* (emphasis added).  In other words, the court did not hold that Kirkindoll had merely failed *to cite* § 1787(c)(3)(A).  It concluded that he had not pleaded a claim that was grounded on the premise that the NCUAB had lawfully repudiated the March 2011 Agreement and that he was entitled as a result to recover actual direct compensatory damages under § 1787(c)(3)(A).  The court therefore rejects this argument as a basis for altering its conclusion in *Kirkindoll V*.

D

Although the court disagrees with Kirkindoll's assertion that the court's conclusion in *Kirkindoll V* should be reconsidered in light of *Johnson*, the court must still consider whether Kirkindoll has shown in response to *Kirkindoll V* that he has pleaded a breach of contract claim that is not preempted.  Kirkindoll maintains that 12 U.S.C. § 1787(c)(3)(A) does not create a separate cause of action for the repudiation of a contract under § 1787(c)(1),

but instead allows a specific, narrow range of damages to a plaintiff who proves a breach of contract based on such a repudiation. He posits that his claim for breach of contract properly pleads a cause of action for repudiation of the March 2011 Agreement. The court agrees.

In his second amended complaint, Kirkindoll alleges the following breach of contract claim based on NCUAB's repudiation of the March 2011 Agreement:

> Defendants entered into a valid and enforceable written contract [(the March 2011 Agreement), which] provided that Plaintiff would receive $234,068.18 within 30 days under the contract conditioned on his agreement to terminate the Plan. Plaintiff Gary Kirkindoll substantially performed by agreeing to terminate the Plan. The Plan terminated on April 1, 2011, and he was to receive $234,068.18 included in a paycheck around April 30, [2]011. Defendants breached their contract with Plaintiff Gary Kirkindoll by failing to pay him any of the agreed to amount. On May 11, 2011, the NCUAB sent Mr. Kirkindoll a letter stating that it had placed Texans into conservatorship on April 15, 2011 and appointed itself conservator. It further stated that the March 2011 Agreement was being repudiated.

2d Am. Compl. ¶¶ 4.24-4.26 (paragraph numbers omitted). Although the allegations are somewhat imprecise,[7] Kirkindoll has adequately pleaded a claim for breach of the March 2011 Agreement based on NCUAB's exercise of its power of repudiation under 12 U.S.C. § 1787(c)(1). *See, e.g., ALLTEL Info. Servs., Inc. v. FDIC*, 194 F.3d 1036, 1039 (9th Cir. 1999) (holding that "[r]epudiation [under similarly-worded 12 U.S.C. § 1821(e)(1), (2)] is treated as a breach of contract giving rise to an ordinary contract claim for damages."

---

[7]For example, Kirkindoll refers to defendants collectively rather than specifically tying the allegations to a particular defendant, and he does not clearly allege that it was NCUAB's repudiation that breached the March 2011 Agreement.

(citations omitted)); *Howell v. FDIC*, 986 F.2d 569, 571 (1st Cir. 1993) ("By repudiating the contract [under 12 U.S.C. § 1821(e),] the receiver is freed from having to comply with the contract, but the repudiation is treated as a breach of contract that gives rise to an ordinary contract claim for damages, if any."). Accordingly, although Kirkindoll's remedies for breach of contract are limited under § 1787(c)(3)(A), he has pleaded a claim that is not preempted by NCUAB's statutory power to repudiate contracts.

E

Having determined that Kirkindoll has pleaded a breach of contract claim against NCUAB that is not preempted, the court now considers under the summary judgment standards[8] whether Kirkindoll is entitled to summary judgment on this claim or defendants

---

[8]As the court explained in *Kirkindoll V*:

> When parties move for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving parties can meet their summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim. Once the moving parties do so, the opposing parties must go beyond their pleadings and designate specific facts showing there is a genuine issue for trial. An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial. Summary judgment is mandatory if the opposing party fails to meet this burden.
>
> When a party moves for summary judgment on a claim or defense on which it will have the burden of proof at trial, the party must establish beyond peradventure all of the essential elements of the claim or defense. This means that the moving parties must demonstrate that there are no genuine and material

are entitled to summary judgment dismissing this claim on grounds that they raised in their motion but that the court did not reach in *Kirkindoll V*.

The court begins with Kirkindoll's motion for summary judgment.   Kirkindoll contends that he has established that NCUAB repudiated the March 2011 Agreement and that he is entitled to recover actual and direct compensatory damages in the amount of $234,068.18, representing the relief provided in 12 U.S.C. § 1787(c)(3)(A).   Because Kirkindoll will have the burden of proof on this claim at trial, he must establish this claim beyond peradventure to be entitled to summary judgment.  *See supra* note 8.

Section 1787(c)(3)(A) limits a party to a repudiated contract to a recovery of "actual direct compensatory damages."   Courts interpreting the nearly identical language in the Financial Institutions Reform, Recovery and Enforcement Act of 1989 have held that, by allowing "actual direct compensatory damages" and specifically excluding, *inter alia*, "damages for lost profits or opportunity,"[9] "Congress appears . . . to have wished to distinguish between those damages which can be thought to make one whole and those that are designed to go somewhat further and put a plaintiff securely in a financial position he or she would have occupied but for the breach."  *Office & Prof'l Emps. Int'l Union, Local 2 v.*

---

fact disputes and that the parties are entitled to summary judgment as a matter of law.   The court has noted that the beyond peradventure standard is heavy.

*Kirkindoll V*, 2014 WL 7178005, at *2-3 (citations and internal quotation marks omitted).

[9]The Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.*, contains this same exclusion. *See* 12 U.S.C. § 1787(c)(3)(B).

*FDIC*, 27 F.3d 598, 604 (D.C. Cir. 1994); *see also ALLTEL Info. Servs*, 194 F.3d at 1041 (holding that "the ascertainable nature of ALLTEL's future profits does not render them recoverable because, rather than making ALLTEL whole, they would put ALLTEL in the financial position it would have occupied but for the breach.  By contrast, the claim for the outstanding accounts receivable balance, allowed by the FDIC, constituted compensation already earned and thus is recoverable."); *McMillian v. FDIC*, 81 F.3d 1041, 1055 (11th Cir. 1996) (holding that "'actual direct compensatory damages' appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation." (citations omitted)).

Kirkindoll argues that he is entitled to recover $234,068.18 in actual direct compensatory damages because this amount represents the sum that "each party agreed would value his rights under the Plan." P. 6/17/14 Br. 8.  Although a reasonable jury could find—based on Kirkindoll's evidence that TCU agreed to pay him $234,068.18 in exchange for his agreement to give up any existing rights he had in the Plan—that the amount necessary to make Kirkindoll whole as a result of NCUAB's repudiation of the March 2011 Agreement is $234,068.18, a reasonable jury could also find that what is necessary to make Kirkindoll whole—i.e., the amount that would compensate Kirkindoll for the value of the rights he gave up when he signed the March 2011 Agreement—is less than that sum.[10]

_____

[10]Awarding Kirkindoll $234,068.18 would put him in the position he would have occupied but for NCUAB's repudiation of the March 2011 Agreement.  But this is not the

- 12 -

Accordingly, Kirkindoll has not established under the heavy beyond peradventure standard that he is entitled to recover "actual direct compensatory damages" under § 1787(c)(3)(A) in the amount of $234,068.18.  The court therefore denies Kirkindoll's motion for summary judgment on his claim for breach of contract based on the repudiation of the March 2011 Agreement.

F

The court now turns to defendants' motion for summary judgment to the extent it pertains to Kirkindoll's breach of contract claim against NCUAB based on the repudiation of the March 2011 Agreement.  Because this claim only remains against NCUAB, the court will refer to defendant's contentions and arguments as if made by NCUAB alone.

1

NCUAB contends that the March 2011 Agreement is not a valid contract because it is not supported by consideration; Kirkindoll cannot recover the relief permitted under § 1787(c)(3)(A) because there could not possibly be any direct or consequential damages arising out of the repudiation of the March 2011 Agreement, given that Kirkindoll never possessed vested Plan benefits; Kirkindoll is asking for an award of damages beyond what the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1751 *et seq.*, authorizes; and Kirkindoll is intentionally circumventing the FCUA statutory scheme for recovering repudiation

---

proper measure of "actual direct compensatory damages" that § 1787(c)(3)(A) permits. *See, e.g., Office & Prof'l Emps. Int'l Union*, 27 F.3d at 604.  Rather, Kirkindoll is only entitled to recover, as "actual direct compensatory damages," the amount necessary to make him whole.

- 13 -

damages by filing suit for money to which he is not entitled under the Plan or the March 2011 Agreement.

2

The court considers together NCUAB's contentions that Kirkindoll could not have incurred "direct or consequential" damages from the repudiation of the March 2011 Agreement because he never possessed Plan benefits, and that the March 2011 Agreement is not a valid contract because it is not supported by consideration. Kirkindoll responds to these arguments by citing the terms of the March 2011 Agreement itself, which provides, in pertinent part:

> A primary purpose of the Distribution is to provide you with a pro rata payout of your Account. You acknowledge that any rights under the Plan are being surrendered and cancelled in exchange for the right to receive the Distribution. Receipt of the Distribution will be subject to the receipt by the Company of this Letter Agreement, signed by you, surrendering and cancelling your rights, if any, under the Plan and to your Account. You acknowledge that receipt of the Distribution constitutes full settlement of your Account, with no further obligations of the Company except as provided herein. You acknowledge that you are aware of the Company's intent to terminate the Plan, and by execution of this Letter Agreement, you hereby waive and relinquish any and all rights under the Plan following the termination of the Plan. You hereby acknowledge and agree to the surrender and cancellation of all of your rights, title and interest in your Account. You understand that the surrender of your rights and interest in your Account pursuant to the procedures described herein and the acceptance thereof will constitute a binding agreement between you and the Company upon the terms and subject to the conditions of this Letter Agreement.

P. 6/28/12 App. 52-53 (bold font omitted). Kirkindoll contends that the terms of the March

- 14 -

2011 Agreement clearly show that his "undisputed consideration was his interest in and rights under the Plan." P. 7/17/14 Br. 25.

Although Kirkindoll's interest in his Plan account had not yet vested at the time he signed the March 2011 Agreement, it is not correct to say that he did not have *any* "rights" under the Plan as of that date. For example, before he signed the March 2011 Agreement and before the Plan terminated on April 1, 2011, he had a right to make a claim for Plan benefits if any of the vesting events occurred. And he also had a right to certain administrative procedures in the event he made a claim for benefits. By signing the March 2011 Agreement, Kirkindoll forwent these and other rights that he had under the Plan, in exchange for a lump sum payment of $234,068.18. The fact that Kirkindoll's interest in Plan benefits was unvested at the time he signed the March 2011 Agreement does not mean that Kirkindoll had no "rights" under the Plan. Nor does this fact preclude Kirkindoll from recovering relief for breach of contract, limited, as provided in § 1787(c)(3)(A), to any "actual direct compensatory damages" that he incurred as a result of NCUAB's repudiation of the March 2011 Agreement.

The court also disagrees with NCUAB's contention that the March 2011 Agreement is not supported by consideration. First, under Texas law, "the existence of a written contract presumes consideration for its execution." *Phila. Indem. Ins. Co. v. White*, 421 S.W.3d 252, 262 (Tex. App. 2013, pet. filed) (citing *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 224 (Tex. App. 2009, pet. denied)). Second, as the court has just explained, Kirkindoll forwent any and all rights that he had under the Plan as consideration for the

- 15 -

promised lump sum amount.  Despite the unvested nature of Kirkindoll's Plan account, he nonetheless had certain "rights" under the Plan that he relinquished in exchange for a lump sum payment of $234,068.18.[11]

3

NCUAB maintains that Kirkindoll is asking for an award of damages beyond what the FCUA authorizes.  The court disagrees.  As the court has explained above, the FCUA authorizes an award of "actual direct compensatory damages."  12 U.S.C. § 1787(c)(3)(A). To the extent Kirkindoll is able to prove his breach of contract claim and that he incurred "actual direct compensatory damages" as a result of the breach, § 1787(c)(3)(A) authorizes such a recovery.  NCUAB is not entitled to summary judgment on this basis.

4

Finally, NCUAB posits that Kirkindoll is intentionally circumventing the FCUA statutory scheme for recovering repudiation damages by filing suit for money to which he is not entitled under the Plan or the March 2011 Agreement.  But defendants concede in their March 2, 2015 response and objection to Kirkindoll's motion for leave to file third amended complaint that, "[i]n the context of conservatorship by the NCUAB, a pre-suit administrative claim is not a jurisdictional prerequisite to seeking repudiation damages under 12 U.S.C. § 1787(c)(3)(A)."  Ds. 3/2/15 Br. 17 n.10.  Accordingly, to the extent that Kirkindoll seeks

---

[11]The court expresses no opinion on whether $234,068.18 represents the value of the rights Kirkindoll relinquished when he signed the March 2011 Agreement.  The court has already concluded that this is a fact question to be resolved at trial.

"actual direct compensatory damages," as authorized by § 1787(c)(3)(A), for breach of contract, the court concludes that he may do so based on his claim for a breach of contract pending in this court. *See, e.g., ALLTEL Info. Servs., Inc.*, 194 F.3d at 1039; *Howell*, 986 F.2d at 571.[12]

5

Because Kirkindoll has raised a genuine issue of material fact regarding his entitlement to recover "actual direct compensatory damages" under 12 U.S.C. § 1787(c)(3)(A) for breach of contract as a result of NCUAB's repudiation of the March 2011 Agreement, the court denies defendants' motion for summary judgment on Kirkindoll's breach of contract claim.

III

The court now turns to defendants' motion for summary judgment on Kirkindoll's state-law claims for fraudulent misrepresentation regarding the Plan, negligent misrepresentation regarding the Plan, and fraudulent inducement regarding the Plan.

A

Kirkindoll relies on a single set of factual allegations to support these claims. He alleges that, when he was offered inclusion under the Plan in 2008, he and Greg Gallant ("Gallant"), another top executive who had been offered Plan participation, wrote an email

---

[12]The court agrees that Kirkindoll cannot seek Plan benefits or damages beyond any "actual direct compensatory damages" incurred as a result of the repudiation. *See, e.g., Kirkindoll V*, 2014 WL 7178005, at *10-13.

to TCU's then-Chief Executive Officer ("CEO") David Addison ("Addison").  The email

was labeled "Subject: 475 Plan Questions" and highlighted certain language in the Plan,

including § 10.2, which dealt with the Board's rights to terminate the Plan at any time,

seeking clarification regarding this language and how it would be applied.  Addison

forwarded the email to Jack Swindle ("Swindle"), a board member of TCU, and asked him

for guidance in responding.  There is no evidence in the summary judgment record that

Swindle responded to Addison's email.  Addison nevertheless answered Kirkindoll's

questions regarding the Plan, telling him that "if [Kirkindoll] performed the services under

this agreement, that [he] would receive payment under this plan upon termination not for

cause."  P. 3/10/15 Br. 5.

## B

Defendants move for summary judgment, contending, *inter alia*, that Addison, the

only person who Kirkindoll alleges made a material misrepresentation regarding the Plan,

did not have the authority to speak on behalf of TCU regarding the terms and conditions of

the Plan.[13]

---

[13]The court interprets defendants' motion to be made in this respect on behalf of all
defendants.  The motion and brief clearly reflect that all defendants intend to move for
summary judgment as to all remaining claims.  And while the court has opted not to rely on
defendants' several other arguments and to focus instead on defendant's reliance on the
absence of evidence that Addison was authorized to speak for TCU, *see, e.g.,* Ds. 2/17/15 Br.
16 ("But it is established beyond peradventure in the summary judgment record that Addison
possessed no authority to speak on behalf of the TCU Board of Directors and/or the Board's
Compensation Committee (in neither of which Addison held membership), the only entities
that could make representations about the Plan as a matter of law."), there is simply no
suggestion in the record that Addison, who was TCU's President and Chief Executive

Kirkindoll responds that Addison had actual authority to make binding statements about the Plan because he was the CEO of TCU.  Alternatively, he argues that TCU's actions clothed Addison with apparent authority to make binding representations about the Plan because Addison was a high-ranking corporate officer, and that making representations about the operation and implementation of plans like the one at issue here fell within the scope of things ordinarily entrusted to one occupying the position of CEO; Addison never informed Kirkindoll that he lacked authority to make representations regarding the Plan; and TCU acted with a lack of due care in correcting Kirkindoll's misperception of Addison's authority when its board member, Swindle, failed to inform Kirkindoll that Addison lacked the authority to speak in a binding manner regarding the Plan, even though Swindle knew that Kirkindoll had directed questions regarding the Plan to Addison.

## C

Under Texas law, "[t]he general rule is that an employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) (citing *Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 357 (Tex. 1971)). "[F]or an employee's acts to be within the scope of employment, 'the conduct must be of the

---

Officer, had any authority to speak on this matter on behalf of Texans, Texans Partners, or TIG.  Accordingly, despite the absence of an explicit reference to Addison's lack of authority to speak for Texans, Texans Partners, and TIG, the court understands defendants' argument in this respect to apply not only to TCU but to Texans, Texans Partners, and TIG.

same general nature as that authorized or incidental to the conduct authorized.'" *Id.* (quoting *Smith v. M Sys. Food Stores, Inc.*, 297 S.W.2d 112, 114 (Tex. 1957)).

To determine whether TCU can be held liable for Addison's allegedly tortious conduct, the court considers whether Addison was acting within the scope of his general authority as CEO of TCU when he made the alleged misrepresentations. "An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). Absent actual or apparent authority, an agent cannot bind a principal. *Huynh v. Nguyen*, 180 S.W.3d 608, 622 (Tex. App. 2005, no pet.).

"Actual authority usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *United Residential Props., L.P. v. Theis*, 378 S.W.3d 552, 564 (Tex. App. 2012, no pet.) (citation and internal quotation marks omitted). "'Actual authority is created through written or spoken words or conduct of the principal communicated to the agent.'" *Id.* (quoting *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549-50 (Tex. App. 2003, no pet.)). The existence of an agency relationship based on actual authority "may be implied from the conduct of the parties or from the facts and circumstances surrounding the transaction in question[, but] cannot be based merely on the words or deeds of the agent." *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 899 (Tex. App. 2007, pet. denied) (citing *Walker Ins. Servs.*,

108 S.W.3d at 550).

Apparent authority "is based on the doctrine of estoppel, and one seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs v. U.S. Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex. 1981) (citing *Sw. Title Ins. Co. v. Northland Building Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778-79 (Tex. 1974); *Chastain v. Cooper & Reed*, 257 S.W.2d 422, 427 (Tex. 1953)).   To determine an agent's apparent authority, the court examines the conduct of the principal and the reasonableness of the third party's assumptions regarding the agency's authority. *Gaines*, 235 S.W.3d. at 183. "[O]nly the conduct of the principal is relevant." *Id*. at 182 (citing *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam)); *see also United Residential Props.*, 378 S.W.3d at 564 ("Apparent authority is based on estoppel, and only the conduct of the principal in leading a third party to believe that the agent has authority may be considered." (citations and internal quotation marks omitted)).   "Declarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183-84 (citing *Sw. Title Ins. Co.*, 552 S.W.2d at 428); *see also Huynh*, 180 S.W.3d at 623 ("Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect.").

D

1

Kirkindoll contends that Addison had "actual authority to make binding statements about the Plan because he was CEO," P. 3/10/15 Br. 7, and that Kirkindoll "reasonably believed that Addison had authority to interpret the Plan and discuss its operation and implementation based on Addison's position as a high-ranking corporate officer," *id.* at 8. Kirkindoll posits that

> [t]he operation and implementation of plans like the one at issue in Mr. Kirkindoll's case are subjects that this Court should find as a matter of law fall within the things ordinarily entrusted to one occupying the position of CEO. In the alternative, a genuine issue of material fact exists as to whether making such representations fell within the scope of things entrusted to Addison as CEO of TCU.

*Id.* at 9.

Kirkindoll has failed to produce any evidence, however, beyond his own unsupported and conclusory allegations, that interpreting the terms of the Plan and advising potential Plan participants about their rights under the Plan fell within the scope of Addison's general authority as CEO of TCU. *See, e.g., Choe v. Bank of Am., N.A.*, 2014 WL 2438378, at *3 (N.D. Tex. May 30, 2014) (Fitzwater, C.J.) (holding that summary judgment nonmovants' "conclusory assertion—unsupported by a proper citation to the summary judgment record—[was] insufficient to withstand summary judgment"), *aff'd*, ___ Fed. Appx. ___, 2015 WL 1285280 (5th Cir. Mar. 23, 2015); *see also Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) ("'[C]onclusory allegations, speculation, and unsubstantiated assertions

are inadequate to satisfy' the nonmovant's burden in a motion for summary judgment."

(quoting *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en

banc))).   In his declaration, Addison avers that he "was never invested with authority to

speak on behalf of the TCU Board of Directors (or its Compensation Committee) about the

terms or conditions of the 457(f) Plan."  Ds. 2/17/15 App. 2.  Kirkindoll has adduced no

evidence that, assumed to be true, refutes Addison's testimony or otherwise would permit a

reasonable trier of fact to find that TCU communicated to Addison that he had the authority

to speak on behalf of TCU regarding the Plan.

2

Kirkindoll has similarly failed to create a genuine issue of material fact that Addison

acted with apparent authority.  Kirkindoll relies on *FDIC v. Texas Bank of Garland*, 783

S.W.2d 604, 607 (Tex. App. 1989, no pet.), in which a Texas court of appeals stated that

"[a]ppointing a person to . . . a position [such as chief executive officer and chairman of the

board] may, in itself, create apparent authority in an employee."  *Id.*  The *Texas Bank of*

*Garland* court noted, however, that "apparent authority in such cases exists only as to those

things ordinarily entrusted to one occupying such a position."  *Id.* (quoting *Rourke v. Garza*,

530 S.W.2d 794, 803-04 (Tex. 1975), *abrogated on other grounds by Ford Motor Co. v.*

*Ledesma*, 242 S.W.3d 32, 45-46 (Tex. 2007)).  Because courts had previously held that

"lending money of a bank in the ordinary course of business is clearly within the scope of

authority of a vice president and general manager of a bank," and because there was evidence

in the record that "[s]omeone who is chairman of the board and chief executive officer would

- 23 -

certainly have the power to issue a letter of credit," the court concluded that the bank's chief executive officer and chairman of the board had apparent authority to act as an agent for his bank in issuing a letter of credit.  *Id.*

Unlike in *Texas Bank of Garland*, the summary judgment record in this case is devoid of evidence as to those things ordinarily entrusted to the CEO of a credit union service organization.  While it is certainly feasible that the CEO of such a company might be entrusted with such tasks as advising upper level employees of their rights under an executive deferred compensation plan, a jury would have no basis on the present record to find that such tasks were within the scope of *Addison's* employment.  Beyond alleging that Addison "reached out to [Kirkindoll] during the hiring process," P. 3/10/15 Br. 4, Kirkindoll adduces no evidence regarding the scope of Addison's authority as CEO of TCU.

3

Kirkindoll's attempt to raise a genuine issue of material fact concerning apparent authority through evidence that Addison forwarded to Swindle Kirkindoll's email containing questions regarding the Plan is also insufficient.  Kirkindoll contends that TCU acted with lack of due care in correcting his misperception of Addison's authority because Swindle, a member of TCU's Board of Directors, "knew that [Kirkindoll] was asking pointed questions regarding Plan language, *and that he was directing those questions to Addison* because he was forwarded the 457 Plan E-mail[, but] Swindle did not inform [Kirkindoll] that Addison lacked authority to speak in a binding manner regarding the Plan."  *Id.* at 9.

As explained above, apparent authority "is based on the doctrine of estoppel, and one

seeking to charge the principal through apparent authority of an agent must establish conduct by the principal that would lead a reasonably prudent person to believe that the agent has the authority that he purports to exercise." *Biggs*, 611 S.W.2d at 629 (citations omitted). "The principal must have affirmatively held out the agent as possessing the authority or must have *knowingly and voluntarily* permitted the agent to act in an unauthorized manner." *NationsBank*, 922 S.W.2d at 953 (emphasis added) (citing *Douglass*, 504 S.W.2d at 778-79); *Huynh*, 180 S.W.3d at 623 (same). Thus "the principal's full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel." *Gaines*, 235 S.W.3d at 182. "[T]he party must show that the principal had full knowledge of all material facts at the time of the conduct alleged to be the basis for the apparent authority." *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 925 (Tex. App. 2011, pet. denied). Thus where there is no evidence that the principal had knowledge of the conduct alleged to constitute the basis of the estoppel, apparent authority cannot be established. *See Rourke*, 530 S.W.2d at 803 (holding that where there was no evidence that company was aware of indemnity provisions included on back of delivery ticket signed by company's superintendent, company was not bound by terms of indemnity provisions under theory of apparent authority); *Neubaum v. Buck Glove Co.*, 302 S.W.3d 912, 919 (Tex. App. 2009, pet. denied) (reversing finding of apparent authority where there was no evidence that principal was aware that agent—who was authorized to fill purchase orders for principal—was making unauthorized loans to third parties on behalf of principal); *Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 240 (Tex. App. 2007, no pet.) (holding that letter

sent by school superintendent did not constitute valid and binding contract because there was no evidence that school district was aware of letter, and superintendent therefore did not have apparent authority to bind school district).

Kirkindoll relies on evidence that Addison forwarded Kirkindoll's email containing questions regarding the Plan to "Jack," and stated, "Below are the questions posed by [Kirkindoll] & [Gallant]. I am not sure if we are recommending changes or just seeking clarification. Please read the email below and let me know your thoughts." P. 3/10/15 App. 59. But Kirkindoll provides no evidence that Swindle responded to Addison's email,[14] that any other members of TCU's Board of Directors knew that Kirkindoll had sent questions regarding the Plan to Addison, or that TCU had any knowledge that Addison would make representations to Kirkindoll regarding the Plan that were inconsistent with the clear language of the Plan itself. Kirkindoll's evidence that Addison forwarded Kirkindoll's email to a single member of TCU's Board of Directors is insufficient, without more, to enable a reasonable jury to find that TCU knowingly and voluntarily permitted Addison to act in an unauthorized manner. *See NationsBank*, 922 S.W.2d at 953 (citing *Douglass*, 504 S.W.2d at 778-79); *Huynh*, 180 S.W.3d at 623.[15]

---

[14]His evidence permits only the finding that Swindle did not respond, because Addison forwarded to Human Resources Representative Pam Anderson ("Anderson") his email to Swindle, noting "These were the issues that [I] forwarded to Jack. I am not sure if he had answers or if the[re] are not issues." P. 3/10/15 App. 59.

[15]In his response, Kirkindoll contends that Anderson, the Human Resources Representative, made "comments about the Plan [that] confirmed Addison's statements." P. 3/10/15 Br. 17; *see also* P. 3/10/15 App. 30 (asserting in Kirkindoll's interrogatory

Because Kirkindoll has failed to raise a genuine issue of material fact concerning whether defendants can be held liable for Addison's alleged misrepresentations regarding the Plan, defendants[16] are entitled on this basis alone to summary judgment dismissing his claims for negligent misrepresentation, fraudulent misrepresentation, and fraudulent inducement.

IV

The court now considers whether NCUAB is entitled to summary judgment dismissing Kirkindoll's claims for fraudulent misrepresentation, negligent misrepresentation, and fraudulent inducement on the alternate basis that they are precluded under the *D'Oench, Duhme*[17] doctrine and its statutory counterpart, 12 U.S.C. § 1788(a)(3).

A

In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942), the Supreme Court held,

---

response that "Plaintiff had subsequent conversations with Pam Anderson which confirmed the terms as described above," i.e., that the Plan "was a 'golden handcuff' to keep him retained at the company . . . [and its purpose] was to keep him employed and Defendants would have to pay Plaintiff under [the Plan] unless he was terminated for cause."). Defendants reply that "there is no evidence before the Court that Anderson was authorized by the Compensation Committee or otherwise empowered to 'confirm' anything about interpretation of Plan terms and benefits, including but not limited to termination rights under Plan Section 10.2, or any statements or opinions expressed by Addison as to such matters." Ds. 3/24/15 Reply 12. The court agrees. As with Addison, Kirkindoll has failed to adduce any evidence that would enable a reasonable jury to find that Anderson's statements confirming Addison's statements were made within the scope of her employment, or that TCU represented to Anderson or to Kirkindoll that she had the authority to make binding representations to Kirkindoll regarding the Plan.

[16]For the reasons explained *supra* at note 13, the court's reasoning applies to all defendants.

[17]*D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942).

as a matter of federal common law, that a "secret agreement" not appearing in the documents contained in a bank's records could not operate as a defense against a suit by the Federal Deposit Insurance Corporation ("FDIC") on a note acquired from a failed bank. *Id.* at 458-59. The court based its decision on "a federal policy to protect [the FDIC] and the public funds which it administers" against misrepresentations that could hinder the FDIC's ability to deal effectively with failed financial institutions. *See id.* at 457.

> If unwritten, unrecorded agreements could form the basis of a valid defense, the FDIC could not accurately assess the value of a bank's holdings. This in turn could hinder the FDIC's ability to carry out purchase and assumption transactions which "must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services."

*First City, Tex.-Beaumont, N.A. v. Treece*, 848 F. Supp. 727, 736 (E.D. Tex. 1994) (citations omitted).

The *D'Oench, Duhme* doctrine "has been extended considerably by the courts" since the Supreme Court's original decision. *In re CTS Truss, Inc.*, 859 F.2d 357, 362 n.8 (5th Cir. 1988); *see also Kilpatrick v. Riddle*, 907 F.2d 1523, 1527 (5th Cir. 1990) ("Since the initial statement of the doctrine in *D'Oench, Duhme*, the [courts have] expanded its preclusive effect well beyond the context of an oral 'secret agreement' between the bank and the borrower."). "Courts and Congress have built on the Supreme Court's controversial decision in [*D'Oench, Duhme*] to develop the body of law that now instructs that one who has dealt with a failed FDIC-insured institution may not assert a claim or defense against the FDIC that depends on some understanding that is not reflected in the insolvent bank's records." *Tex.*

*Refrigeration Supply v. FDIC*, 953 F.2d 975, 978-79 (5th Cir. 1992). "Today, virtually all unwritten agreements are subject to the doctrine's preclusive effect, not just those between the borrower and the bank." *First City, Tex.-Beaumont*, 848 F. Supp. at 737 (citing *RTC v. Oaks Apartments Joint Venture*, 966 F.2d 995, 998 (5th Cir. 1992) ("The doctrine also precludes the enforcement of any defense or claim based upon a written agreement that is not found within the financial institution's records covering the instant financial transactions.")).

In 1950, Congress codified *D'Oench, Duhme* into what is now 12 U.S.C. § 1823(e). Section 1823(e) requires agreements that "tend[] to diminish or defeat" the "interest" of the FDIC in any asset to meet its exacting standards. 12 U.S.C. § 1823(e). The agreement must be (1) in writing, (2) executed contemporaneously with the acquisition of the asset by the bank, (3) approved by the bank's board of directors in compliance with standard procedures, and (4) maintained as an official record of the bank. *Id.* Originally, § 1823(e) was available to the FDIC only in its corporate capacity. *See, e.g., Beighley v. FDIC*, 868 F.2d 776, 783 (5th Cir. 1989). In 1989 Congress amended § 1823(e) to make it available to the FDIC in its receiver capacity as well. *See Kilpatrick*, 907 F.2d at 1526 n.4.

The FCUA contains language nearly identical to 12 U.S.C. § 1823(e).[18] *See* 12 U.S.C.

---

[18]12 U.S.C. § 1788(a)(3) provides, in pertinent part:

> No agreement which tends to diminish or defeat the right, title, or interest of the Board, in any asset acquired by it under this subsection, either as security for a loan or by purchase, shall be valid against the Board unless such agreement —
> (A) shall be in writing;
> (B) shall have been executed by the credit union and the person

§§ 1787(p)(2) and 1788(a)(3).[19]  And because "all of the agencies which regulate financial institutions are in the similar special position of safeguarding the interests of the depositors at large," *Savoy v. White*, 788 F. Supp. 69, 72 (D. Mass. 1992), courts have applied the *D'Oench, Duhme* doctrine and case law interpreting 12 U.S.C. § 1823(e) to claims by and against the NCUAB.  *See, e.g., Acciard v. Whitney*, 2009 WL 8174976, at *2 (M.D. Fla. May 18, 2009) (holding that *D'Oench, Duhme* doctrine barred fraud and related claims asserted against NCUAB, in its capacity as liquidating agent for credit union, because claims all rested upon unwritten representations that would tend to diminish or defeat NCUAB's interest in credit union's assets); *Nat'l Credit Union Admin. v. Ticor Title Ins. Co.*, 873 F. Supp. 718, 724 (D. Mass. 1995) ("The *D'Oench* doctrine applies to disputes involving the NCUA." (citation omitted)).

---

> or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the credit union;
> (C) shall have been approved by the board of directors of the credit union, which approval shall be reflected in the minutes of such board; and
> (D) shall have been continuously, from the time of its execution, an official record of the credit union.

[19]Section 1787(p)(2) is identical to § 1788(a)(3). Section 1787(p)(2) applies when the NCUAB is acting as receiver or liquidating agent, and § 1788(a)(3) applies when NCUAB is acting as conservator. *See Savoy v. White*, 788 F. Supp. 69, 71 n.1 (D. Mass. 1992); *see also Gulfstream Dev. Grp., LLC v. Schwartz*, 2009 WL 1107751, at *2 (M.D. Fla. Apr. 22, 2009) ("'The substantive language [of 12 U.S.C. § 1787(p)(2)] is identical to that in the provision governing situations where the agency is acting as conservator of the credit union, *see* 12 U.S.C. § 1788(a)(3)[.]'" (quoting *Savoy*, 788 F. Supp. at 72)).

B

Defendants move for summary judgment under § 1788(c)(3) and the *D'Oench, Duhme* doctrine, contending that Kirkindoll's tort theories rest on the premise that he had an unwritten side agreement with Addison pursuant to which he was entitled to an unspecified payout of Plan dollars (whether vested or not) in the event of losing his job prior to attaining normal retirement age; that "[b]y their very nature, fraudulent inducement, as well as fraudulent and negligent misrepresentation claims by former credit union executives infer that there were secret agreements or plans that were not reduced to writing and that were not approved by the credit union's board of directors," and, as such, they are barred and unenforceable. Ds. 2/17/15 Br. 24.

Kirkindoll responds that neither the *D'Oench, Duhme* doctrine nor 12 U.S.C. § 1788(a)(3) bars his tort claims because they are "free-standing torts" that fall outside the scope of the doctrine and its codification. He relies on *In re Geri Zahn, Inc.*, 25 F.3d 1539 (11th Cir. 1994), to argue that if a tort is sufficiently "unrelated" to the regular banking transactions of an institution, then it is not barred by the *D'Oench, Duhme* doctrine and may be asserted against the conservator. Kirkindoll contends that "regular banking transactions" for "relatedness" purposes include extending credit through a writing, negotiating loans, making representations about loans, and agreeing to loan money and that because his tort causes of action concern "internal [human resources] matters" concerning executive retention, neither the Plan nor Addison's misrepresentations regarding the Plan implicate the records of regular banking transactions. P. 3/10/15 Br. 12, 13.

- 31 -

C

The court holds that NCUAB is entitled to summary judgment dismissing Kirkindoll's claims for fraudulent misrepresentation, negligent misrepresentation, and fraudulent inducement on the alternate basis that they are barred under the *D'Oench, Duhme* doctrine. Although the Eleventh Circuit recognizes a "narrow exception" to the *D'Oench, Duhme* doctrine when a plaintiff asserts "free standing tort claims," *In re Geri Zahn*, 25 F.3d at 1543, Kirkindoll has not demonstrated that this exception is, or would be, recognized in this circuit. Because Kirkindoll provides no other basis for rejecting application of the *D'Oench, Duhme* doctrine, the court holds that this doctrine and 12 U.S.C. § 1788(a)(3) apply in this case.

Moreover, the court agrees with defendants' contention that "NCUAB was unquestionably entitled to rely upon the written top hat Plan when evaluating TCU's fiscal status and viability in order to 'preserve the going concern' and 'avoid an interruption in [TCU's] services.'" Ds. 3/24/15 Reply Br. 2-3 (quoting *Langley v. FDIC*, 484 U.S. 86, 91 (1987)). Were Kirkindoll permitted to recover against NCUAB on his tort claims based on unwritten misrepresentations regarding TCU's written Plan, this would undermine the central purpose of the *D'Oench, Duhme* doctrine. It would mean that other claimants could make similar claims. Like the FDIC, when the NCUAB takes over for a failed credit union, it must be able to rely on the written records to accurately assess the value of the credit union. If it cannot rely on the integrity of the records, this can hinder the NCUAB's ability to carry out its statutory responsibilities. *See, e.g., First City, Tex.-Beaumont*, 848 F. Supp. at 736 (referring to FDIC's ability to carry out purchase and assumption transactions, which "must

be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." (citations and internal quotation marks omitted)).

Accordingly, to the extent Kirkindoll's claims for fraudulent misrepresentation, negligent misrepresentation, and fraudulent inducement are asserted against NCUAB, the court grants defendants' motion on the alternative basis that they are barred under the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1788(a)(3).

\* \* \*

In summary, the court holds that Kirkindoll has alleged a breach of contract claim based on NCUAB's repudiation of the March 2011 Agreement, the available relief for which is limited by 12 U.S.C. § 1787(c)(3)(A); that Kirkindoll is not entitled to summary judgment in his favor on this claim; that NCUAB is not entitled to summary judgment on this claim; but that Texans, Texans Partners, and TIG are entitled to summary judgment dismissing Kirkindoll's breach of contract claim. The court therefore denies Kirkindoll's June 17, 2014 motion for summary judgment to the extent addressed to his claim for breach of contract based on NCUAB's repudiation of the March 2011 Agreement, and it grants in part and denies in part defendants' June 17, 2014 motion for summary judgment as to this claim. The court denies as moot Kirkindoll's February 10, 2015 motion for leave to file third amended complaint.

The court grants defendants' February 17, 2015 motion for summary judgment on Kirkindoll's claims for fraudulent misrepresentation, negligent misrepresentation, and

fraudulent inducement.

Based on the substitution of NCUAB as a party in place of TCU, and on the court's memorandum opinions and orders filed on December 17, 2014 and today, the court enters a Rule 54(b) final judgment dismissing Kirkindoll's actions against all defendants except NCUAB.  The court will set the remainder of the case for trial by separate order.

**SO ORDERED**.

April 13, 2015.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE